27 N.J. Super. 594 (1953)
99 A.2d 849
ARTHUR F. NAYLOR, ET ALS., PLAINTIFFS,
v.
THOMAS J. HARKINS, ET ALS., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided October 16, 1953.
*597 Mr. James M. Davis. Jr., for the plaintiffs.
*598 Mr. Clifford D. O'Brien, of the Illinois Bar, admitted pro hac vice for defendants (Mr. Horace G. Brown, of counsel; Mr. Horace G. Brown and Miss Ruth Weyand, of the Illinois Bar, on the brief).
GOLDMANN, J.S.C.
The present case is conspicuous for its voluminous record, lengthy and involved briefs, and the large number of pleadings and papers comprising the file. To set out all the facts in any way connected with the matter would serve no purpose and would indeed be confusing.
This action arises from an intra-union dispute between the Grand International Division of the Brotherhood of Locomotive Engineers and certain members of Division 851, a unit of Brotherhood. The early phases of the present difficulty can be traced back to about 1940 when engineers, firemen and trainmen in the employ of the Pennsylvania Railroad Company ("Pennsylvania") began to file claims for an additional day's compensation for each time they operated a train on tracks owned by other railroads. Operation of Pennsylvania's trains on tracks of foreign railroads on the Delaware River waterfront, Philadelphia, was the basis of one such group of claims, and it is out of this group that the present action arose.
In 1948 Pennsylvania agreed to settle the waterfront claims by allowing the employees concerned one day's extra pay for each day they worked on foreign trackage, if the employees would forego that pay for future operations in return for Pennsylvania's establishing higher rates of pay for jobs involving the operation of trains on foreign tracks. Three unions were involved: the Brotherhood of Locomotive Firemen and Enginemen, the Brotherhood of Railroad Trainmen, and the Brotherhood of Locomotive Engineers, a defendant in this suit. The settlement plan was accepted by the Brotherhoods representing the firemen, enginemen and trainmen.
At a regular meeting of Division 851 held April 23, 1951 it was proposed that the settlement offer of Pennsylvania, *599 accepted by the other Brotherhoods, also be accepted by the Division. A resolution to that effect carried.
Plaintiff Naylor, a locomotive engineer in the employ of Pennsylvania, had for some time been local chairman of Division 851. In January 1950 he was elected chairman of the local committee of adjustment for a three-year term. In this latter capacity one of his functions was to negotiate, along with the other members of the Brotherhood's General Committee of Adjustment, with the railroad regarding wages and other conditions of employment. By its resolution of April 23, 1951, Division 851 directed Naylor to accept the settlement. After the Division had voted in favor of the resolution the Brotherhood of Locomotive Engineers notified Pennsylvania of this desire, and the railroad, acting through its superintendent H.L. Nancarrow, drew up the necessary papers to effectuate the settlement.
On April 28, 1951 Naylor announced that he would not approve the settlement, asserting he had authority to do so under the so-called "Philbrook Resolution" of the Brotherhood. That resolution provided that "no written agreement shall be made without the approval in writing from the Local Chairman or Local Chairmen of the seniority district or seniority districts." On May 3, 1951 Naylor instituted a suit in the United States District Court for the District of New Jersey against Pennsylvania and sought thereby to enjoin the railroad from concluding the agreement with the engineers through Edward Menges, chairman of the General Committee of the Brotherhood, without first obtaining Naylor's approval. In bringing this action in the federal court Naylor maintained that he was acting under authority of Standing Rule 48(c) of the Brotherhood which reads in part as follows:
"Each and every member of the Brotherhood of Locomotive Engineers grants to the duly authorized representative and/or representatives of the Brotherhood (which includes * * * Local Chairmen * * *) full and complete authority to present and handle each and every member's claims, complaints, and grievances against the railroad on which he is employed. Said power and authority * * * shall also include the power and authority *600 to submit such claims, complaints, and grievances, for determination to any person, court, or board or other tribunal provided by law or otherwise as may be deemed necessary or advisable by such authorized representatives."
Subsequently, on June 26, 1952, the District Court held that Naylor's relief, if any, should be sought in the administrative tribunals set up by the Railway Labor Act, 45 U.S.C.A. § 151 et seq. (Naylor v. Pennsylvania R. Co., 106 F. Supp. 84 (D.C.N.J. 1952))
On May 12, 1951 James E. Jefferson, one of the members of Division 851 who had asserted a claim for extra pay for work on foreign tracks, formally charged Naylor with violating, among other things, section 93 of the Statutes of the Brotherhood. That section provides that any Brotherhood member who submits a controversy arising within the union, and for which the laws of the Brotherhood provide a means of settlement, to a civil court for decision without first exhausting all his remedies within the Brotherhood, shall be deemed guilty of disloyalty.
The union procedure governing the preferring of charges is set forth in section 72 of the Statutes of the Brotherhood. Among the requirements of the section is that the chief engineer of the Division to which the accused member belongs establish a committee to investigate the charges and report its findings at the next regular meeting. A committee of three members was duly appointed at a regular meeting of Division 851 held on May 14, 1951. The committee thereupon reported that Naylor had violated the Statutes of the Brotherhood by instituting suit in the federal court. At the same meeting Naylor was temporarily removed from membership and office in the Brotherhood. J.P. Shields, Grand Chief Engineer of the Brotherhood, then reviewed the proceedings of the Division action, under authority granted him by section 6(c) of the Constitution of the Brotherhood, and on May 15, 1951 set them aside on the ground that Brotherhood law had not been complied with. Shields further directed that a new trial be had and a complete record thereof kept.
*601 Thereafter, on May 28, 1951, Jefferson once again charged Naylor with having breached Brotherhood law by the institution of the District Court action. On June 25, 1951 a duly appointed investigating committee reported that although there was insufficient evidence to support one of the charges against Naylor, there was sufficient evidence that he had violated section 93 of the Statutes. On this occasion Naylor protested his innocence and stated that he was pleading not guilty and offering evidence to support his position. He did so. A vote was then taken, the members voting 44 to 9 against accepting the report of the committee. Naylor announced his intention to continue the action he had instituted in the federal court.
On July 5, 1951 Brotherhood Grand Chief Engineer Shields, in a letter to Raymond Long, Chief Engineer of Division 851, stated that he had received from defendant Harkins, who was Assistant Grand Chief Engineer of the Brotherhood and who presided at the meeting of Division 851 on June 25, 1951, a complete report of the proceedings, and that he could not understand the vote of the members in view of the "incontrovertible evidence of Brother Naylor's guilt and their duty as members under the plain language of the law applicable in such cases." Shields reviewed the evidence and concluded that Naylor had instituted a civil action concerning a controversy within the organization, without first having exhausted his remedies within the Brotherhood, thereby violating section 93 of the Statutes. He directed that the vote of June 25 be set aside, that the Division give the matter further consideration, and that Naylor be found guilty of disloyalty and expelled from the union. Shields further stated that if his instructions were not complied with by July 23, 1951, the charter of Division 851 would be suspended and the directions contained in his letter go into effect without further ruling.
Division 851 met on July 9, 1951 and voted to reject Shields' letter of July 5. On July 23, 1951, the date set for the next regular meeting of the Division, Naylor commenced this action and obtained an order to show cause and *602 temporary restraint against Assistant Grand Chief Engineer Harkins acting in the premises. Accordingly, the meeting scheduled for that evening was not held.
On August 8, 1951 Shields sent a letter addressed to the officers and members of Division 851 in which he afforded the Division an opportunity to carry out the directions set out in his previous letter of July 5, 1951. He stated that the charter of Division 851 would not be revoked if such action were taken at the meeting regularly scheduled for August 13, 1951. Shields further informed the Division officers and members that his action was concurred in by the members of the Advisory Board of the Brotherhood. The letter advised that section 48(c) of the Standing Rules did not authorize a local chairman to have recourse to courts respecting any controversy within the Brotherhood or with a carrier until the various remedies within the union, or those set up by the collective bargaining agreement or the Railway Labor Act, were exhausted.
Division 851 held its scheduled meeting on August 13, but Naylor at once questioned the right of the secretary-treasurer to read the August 8 letter sent by Shields. It was not read, despite the fact that several members asked that this be done. Upon learning of this action Shields ruled that Division 851 had become demoralized, within the meaning of section 6(e) of the Brotherhood Constitution which provides that:
"When in the opinion of the Grand Chief Engineer a Division has become so demoralized as to be a detriment to the Brotherhood he shall have authority to revoke the Charter of such Division, pending the action of the next Convention of the G.I.D. [Grand International Division]."
The charter of Division 851 was revoked August 14, 1951, and on the same date Shields wrote Naylor and also the "former" officers and members of the Division. The letter to Naylor informed him that he was expelled from the union and directed him to turn over any Brotherhood records which might be in his possession. The letter to the "former" *603 officers and members notified them that the charter of Division 851 was revoked and that loyal former members of Division 851 were transferred to Division 109. Subsequently, some 143 former members of Division 851 applied for membership in Division 109 and were admitted. And on February 14, 1952, upon application of 25 former members of Division 851, a charter was granted for a new division, designated Division 763. Some of the former members of Division 851, plaintiffs in this action, continued to hold monthly meetings, claiming to be members of Division 851.
A supplemental complaint was filed, and subsequently an amended supplemental complaint. These pleadings added parties. Plaintiff Naylor is joined with numerous other plaintiffs who are firemen and engineers formerly in the ranks of Division 851. Naylor seeks damages and his reinstatement as member and officer of Division 851. The various other plaintiffs ask for the restoration of the charter of Division 851 and also seek damages.
On April 28, 1952 the Brotherhood executed an agreement of the "closed shop" type with Pennsylvania. This agreement, effective May 5, 1952, required that engineers, as a condition of their continued employment with Pennsylvania, become members of the Brotherhood within a stipulated period of time. However, the requirement was not to apply to "an employe to whom membership has been denied or terminated for any reason other than the failure to tender periodic dues, initiation fees and assessments." Fearing that this agreement would require the carrier to discharge them if they still maintained membership in the defunct Division 851, or that the present action would become moot if they, in the alternative, rejoined the regular ranks of the Brotherhood, plaintiffs sought a preliminary injunction in the Chancery Division enjoining defendants from informing the railroad that plaintiffs were not members of the Brotherhood. This injunction was granted pending trial, upon condition that plaintiffs pay into court the various dues required by the Grand International Division of the Brotherhood and by the General Committee of Adjustment *604 for the Pennsylvania Lines-East. The Brotherhood appealed under former Rule 4:2-2(a)(1), now R.R. 2:2-3(a)(1), and the appeal was certified by the Supreme Court on its own motion. That court affirmed. 11 N.J. 435 (1953).
This opinion deals with the merits of the case; issues raised by the parties and ruled upon by the Supreme Court are not considered.
Plaintiff Naylor asserts that his removal proceedings were invalid because brought about by malice on the part of the responsible officials; that he was the victim of a conspiracy between these various officials and members of the Brotherhood on the one hand and Pennsylvania on the other; and that his expulsion was in violation of Brotherhood law.
The presence of malice and the existence of a conspiracy are fundamentally questions of fact. The extended trial of this cause has been responsible for a very large and most complete testimonial record. A review of this record convinces me that the issues of malice and conspiracy must be decided against plaintiffs.
Malice has been defined as "the intentional doing of a wrongful act without justification or excuse." Brennan v. United Hatters of North America, Local No. 17, 73 N.J.L. 729, 744 (E. & A. 1906). Louis Schlesinger Co. v. Rice, 4 N.J. 169 (1950). As for conspiracy, its essential elements are: (1) a combination of two or more persons; (2) a real agreement or confederation with a common design; and (3) the existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful means. 11 Am. Jur., Conspiracy, § 4, p. 544. The elements of both the criminal offense of conspiracy and the so-called "civil conspiracy" are identical, except that in order to recover for the latter a plaintiff must prove, in addition to the component parts of the offense, special damages. 11 Am. Jur., Conspiracy, § 45, p. 578; McGrath v. Keenan, 24 N.J. Misc. 121 (C.P. 1946). It is basic that the burden of proving both malice and conspiracy is upon the party charging them. Plaintiffs' brief reviews in great detail portions of the evidence which they consider support their contentions. I do *605 not agree that they do. The record does not establish that either the officers or members of the Brotherhood charged by plaintiffs with acting maliciously did in fact do so. Not only has there been no showing of "the intentional doing of a wrongful act without justification or excuse," but, to the contrary, the actions complained of could well have been, and indeed clearly appear to have been, taken in order to preserve and to further the common aims of the Brotherhood, rather than to do injury to plaintiffs.
The record likewise entirely fails to establish that defendants entered into a conspiracy against plaintiffs. Proof is lacking that there was any conspiratorial agreement among them to expel plaintiff, and this must be established before the legality of the means or the ends can be inquired into.
Plaintiffs have also failed to establish that in expelling Naylor or in revoking the charter of Division 851 defendants have violated Brotherhood law. In this connection certain fundamental propositions guide a civil court when it intervenes in a controversy within a voluntary association, of which a labor union is an example. Associations have the right to adopt reasonable rules and regulations, usually found in their constitutions and by-laws. These rules and regulations bind the members and have been held to constitute a contract between them. Harker v. McKissock, 1 N.J. Super. 510 (Ch. Div. 1948). For a violation of these laws the association may take disciplinary measures in the form of expulsion of members or disenfranchisement of groups.
"Membership in an association or society is based upon the implied, if not express, condition of loyalty. The power of expulsion is included in what may be denominated the police power of such an organization, which is derived from the law of self-preservation. It must have the power to relieve itself of its discordant elements, in order that harmony may prevail, and therefore, it has the right to establish by-laws providing for the expulsion of members transgressing their reasonable provisions." 4 Am. Jur., Associations and Clubs, § 22, p. 469.
Civil courts are naturally quite loath to interfere in intra-group affairs. As a result it is usually held that before a *606 member may seek relief in the courts he must first exhaust his remedies within the association, if any be available. Franklin v. Penna.-Reading Seashore Lines, 122 N.J. Eq. 205, 216 (Ch. 1937); Walker v. Penna.-Reading Seashore Lines, 142 N.J. Eq. 588 (Ch. 1948); Chafee, The Internal Affairs of Associations Not for Profit, 43 Harv. L. Rev. 993 (1933).
The function of the court is limited where judicial review is accorded.
"* * * It is to be realized that Chancery does not furnish a retrial of the case to determine anew the guilt or innocence of the union member. * * * The inquiry when undertaken by this court is usually concentrated on the good or bad faith inspiring the action of the union and on whether the expulsion of the member and the underlying causes are capricious or contrary to public policy and natural justice." Dragwa v. Federal Labor Union No. 23070, 136 N.J. Eq. 172, 174 (Ch. 1945).
Or, as stated in Franklin v. Penna.-Reading Seashore Lines, 122 N.J. Eq. 205, 217 (Ch. 1937):
"When the officers of an association such as this in good faith, and in a reasonable, proper and legal manner under their by-laws and constitution exercise their duties as a tribunal to settle disputes on matters pertaining to the association or the rights of any of its members, such exercise cannot be questioned collaterally; the courts may judge whether the exercise is arbitrary, and review the form of proceedings to see whether the tribunal has acted within its jurisdiction and in the line of order, but cannot review the case on its merits. Courts entertain jurisdiction to keep these tribunals within their own laws, and to correct abuses, so as to preserve, on the one hand, the right of the association, and on the other, that of the members; but they do not inquire into the merits in a regular course of proceeding."
In short, if it is found that a proceeding before the tribunal of the association was had fairly, in good faith, and was not in violation of the law of the state, the decision is conclusive. 4 Am. Jur., Associations and Clubs, § 27, p. 472; Zeliff v. Knights of Pythias, 53 N.J.L. 536 (Sup. Ct. 1891).
The record reveals that plaintiff Naylor was twice subject to disciplinary proceedings. The first instance occurred at *607 the meeting of May 14, 1951 when he was placed under temporary arrest and removed from office. This action was subsequently set aside by Grand Chief Engineer Shields for failure to conform to Brotherhood law. The next proceeding took place at the meeting of June 25, 1951, at which time Naylor was found to have violated section 93 of the Statutes of the Brotherhood by the three-man investigating committee. The members of Division 851 then voted to reject the report of the committee. Shields once again intervened and again set aside the action of the Division.
According to the evidence, Naylor was present at both the May 14 and June 25 meetings. He spoke in his own behalf, admitted the institution of the federal court action, and justified it on the basis of Standing Rule 48(c) of the Brotherhood. He was accorded notice and an opportunity to be heard. Shields acted in an appellate capacity in both instances, relying upon section 6 (c) of the Constitution of the Brotherhood. This section provides that the Grand Chief Engineer
"* * * shall have the authority to demand and review the records of any trial conducted in a Division when same is brought to his attention by any Division or member of the B. of L.E. [Brotherhood of Locomotive Engineers], and if it is apparent from the records of such trial that same has not been conducted or disposed of in accordance with the law and evidence, he shall have the power to order a new trial of the case and direct that a complete record of same be kept for his information. If it is apparent from the complete record of the trial so ordered that the verdict has not been rendered in accordance with the law and evidence he will then, with the concurrence of the Advisory Board, have the power to set such verdict aside and direct a verdict, and impose a penalty in accordance with the law, and evidence, which verdict, or penalty, will be subject to appeal to the G.I.D. [Grand International Division] only, and any Division refusing to apply the verdict in accordance with the foregoing instruction will have its Charter suspended at his discretion."
It is apparent from the provisions of this section that it was the intention of the Constitution of the Brotherhood to invest the Grand Chief Engineer with broad appellate and supervisory powers.
*608 Plaintiffs contend that section 6(c) is inapplicable because there was no "trial" within the meaning of that section. I cannot agree. A trial before a union tribunal "need not be conducted with the formality and established precision of our public courts." Dragwa v. Federal Labor Union No. 23070, 136 N.J. Eq. 172, 174 (Ch. 1945). Both of the disciplinary meetings were featured by the appointment of an investigatory committee, an inquiry into the sufficiency of the evidence of Naylor's guilt, a committee report, an opportunity for Naylor to speak in his behalf before the Division membership, and action by the Division. Note may be taken of the provision of section 73(b) of the Statutes of the Brotherhood that "If the [Investigating] Committee reports sufficient reasons for proceeding with trial and same is rejected by the Division, that shall end the proceedings unless charges are renewed." This would seem to give to a rejection of the committee report some of the characteristics of a judgment of dismissal. When these factors are considered it requires no stretching of the meaning of the word "trial" to hold that the conditions prerequisite to the Grand Chief Engineer's intervention under section 6(c) of the Constitution had been satisfied.
Plaintiffs also rely upon the above-quoted section 73 of the Statutes as precluding review by the Grand Chief Engineer unless the charges were renewed. In reply it is contended that this section applies only to further proceedings within the Division and could in no way limit the power of review granted the Grand Chief Engineer by the Brotherhood Constitution. This is a reasonable and proper construction, joined in and approved by the Advisory Board of the Brotherhood, under the quoted section 6(c) of the Constitution, since all of the board members (except for one absent from the country) concurred in the expulsion of Naylor and the revocation of the charter of Division 851. It has been held that
"* * * the construction of the organic agreement, by-laws, rules and regulations of a benefit society or other unincorporated voluntary association belongs, not to the court, but to the board, *609 council, or other tribunal provided for the purpose in the organization, if any." Simpson v. Grand International Brotherhood of Locomotive Engineers, 83 W. Va. 355, 98 S.E. 580, 587 (Sup. Ct. App. 1919), cert. den. 250 U.S. 644, 39 S.Ct. 494, 63 L.Ed. 1186 (1919).
The procedure followed by Grand Chief Engineer Shields was in accordance with the laws of the Brotherhood; sections 6(c) and 6(e) of the Brotherhood Constitution provided ample authority for his expulsion of Naylor and revocation of the charter of Division 851. Plaintiffs have not shown that his action violated either the law of the land or natural justice, or that it was motivated by bad faith.
The Grand Chief Engineer determined, and the Advisory Board agreed, that Naylor had violated Brotherhood law and that his reliance upon Standing Rule 48(c) constituted no justification. Shields also determined that Division 851 had become so demoralized as to warrant the revocation of its charter. In accordance with established principles this court will not pass upon the merits of these issues and thereby substitute its judgment for that of the Brotherhood tribunals. Dragwa v. Federal Labor Union No. 23070, Walker v. Penna.-Reading Seashore Lines, above.
Simpson v. Grand International Brotherhood of Locomotive Engineers, supra, 98 S.E. at page 589, is strikingly similar to the present case, and the following excerpts from that opinion may appropriately be quoted:
"* * * Neither the constitution, statutes, nor rules of the association forbid the placing of an accused member in jeopardy a second time. If, in the absence of any provision on the subject, there is a presumption of intent to adopt this provision of organic state law, it is clearly overthrown by the practically unlimited powers vested in the Grand International Division to whom the Grand Chief Engineer makes his triennial reports, and whose representative and spokesman he is, when that body is not in session. In the absence of an express provision, guaranteeing immunity from second trial for the same offense, the right of interpretation and construction exists, and that right is vested in the Grand Chief Engineer. When his decision is reported to the G.I.D., it is subject to the action of that body * * *. The powers thus vested in it [G.I.D.] expressly exclude any presumption of intent to adopt the limitations and rules of the civil laws, respecting *610 either procedure or substantive rights in the order. They do not override legal limitations imposed upon the powers of such organizations, of course, but nothing in the civil law inhibits a second trial of a member of a voluntary association for the same offense against his will. * * *
The propositions on which these observations stand are obvious corollaries of others to which the courts have yielded practically unanimous assent. The expulsion of a member of a voluntary association, * * * after notice, an opportunity to be heard and a trial fairly conducted agreeably to the laws of the association, is conclusive upon the civil courts."
Judgment for defendants.