32 N.J. Super. 559 (1954)
109 A.2d 19
ARTHUR F. NAYLOR, ET AL., PLAINTIFFS-DEFENDANTS,
v.
THOMAS J. HARKINS, ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 14, 1954.
Decided November 3, 1954.
*560 Before Judges JAYNE, STANTON and HALL.
Mr. James M. Davis, Jr., argued the cause for the plaintiffs-appellants (Mr. James A. Matthews, of counsel).
Mr. Clifford D. O'Brien of the Illinois Bar argued the cause for the defendants-respondents (Messrs. Horace G. Brown and Howard G. Kulp, Jr., attorneys; Miss Ruth Weyand of the Illinois Bar, of counsel).
The opinion of the court was delivered by STANTON, J.S.C. (temporarily assigned).
This action was brought by Naylor, and later the other plaintiffs, who are also members of Division 851 of the Brotherhood of Locomotive Engineers, hereinafter called the Division, joined in it. The defendants are Grand International Division of the Brotherhood of Locomotive Engineers, hereinafter called *561 the Brotherhood, Thomas J. Harkins, its Assistant Grand Chief Engineer, and Locomotive Engineers Mutual Life and Accident Insurance Association, an affiliate of it. The plaintiffs seek the restoration of the charter of Division 851 and damages resulting from the alleged improper revocation of it. Naylor seeks reinstatement as a member and officer of the Division and damages as the result of his expulsion. They also seek the maintenance of their rights as members and insured of the insurance association. There was a dismissal of the complaint and the plaintiffs appeal therefrom.
The record in this case is voluminous and involved. Time and space may be conserved by referring to the opinion of the Supreme Court reported in 11 N.J. 435 (1953), where it was held that the Chancery Division had jurisdiction of this action and that the allowance of an interlocutory injunction was proper. Certain background material may be found in the opinion of the Chancery Division reported in 27 N.J. Super. 594, and in Naylor v. Pennsylvania R. Co., 106 F. Supp. 84 (D.C.N.J. 1952).
It may serve convenience if there is set forth at this point excerpts from the constitution, statutes and rules of the Brotherhood which have applicability here:

CONSTITUTION

"DUTIES OF THE GRAND CHIEF ENGINEER

* * *
Sec. 6.(b) He shall interpret the law of the G.I.E. according to its plain and obvious meaning, decide all controversies which may be appealed from Divisions, and after a careful examination of the subject he shall make out and forward to the Divisions making the appeal his written decision in the case and such decision shall be final and conclusive until the Triennial Convention of the G.I.D., at which time the aggrieved member may appeal to the G.I.D., providing the Division to which the aggrieved member belongs has at least thirty (30) days' notice of said appeal, and a majority vote shall be necessary to reverse the decision.
(c) He shall have the authority to demand and review the records of any trial conducted in a Division when same is brought to his attention by any Division or member of the B. of L.E., and if it is apparent from the records of such trial that same has not been conducted or disposed of in accordance with the law and evidence, he *562 shall have the power to order a new trial of the case and direct that a complete record of same be kept for his information. If it is apparent from the complete record of the trial so ordered that the verdict has not been rendered in accordance with the law and evidence, he will then, with the concurrence of the Advisory Board, have the power to set such verdict aside and direct a verdict, and impose a penalty in accordance with the law, and evidence, which verdict, only, and any Division refusing to apply the verdict in accordance with the foregoing instruction will have its Charter suspended at his discretion. * * *
(e) When in the opinion of the Grand Chief Engineer a Division has become so demoralized as to be a detriment to the Brotherhood he shall have authority to revoke the Charter of such Division, pending the action of the next Convention of the G.I.D. * * *"

STATUTES

"CHARGES

* * *
Sec. 72. It shall be the duty of any member who has knowledge that a member has violated any requirement, duty, law, rule, regulation, or obligation of the Brotherhood, to bring charges in writing against such offending member, and upon the failure of any member having such knowledge to bring such charges it shall be the duty of the Chief Engineer of the Division to which the offending member belongs, when knowledge of such violation shall come to his attention, to bring such charges. Such charges shall be filed with the Secretary-Treasurer of the Division to which the offending member belongs, and shall state specifically the offense charged, and the section or sections, of the written law, or obligations, of the Order violated. When more than one offense is charged each offense shall be set out separately. The Chief Engineer of the Division shall, at the next regular meeting thereof, after charges are preferred, cause the Secretary Treasurer to read said charges in open meeting and appoint a Committee of three to investigate the charges and report its findings to the next regular meeting, unless further time shall be given.

INVESTIGATING COMMITTEE.
Sec. 73(b). The Committee shall only report its findings and will make no recommendation. Should the committee report that they find sufficient cause for proceeding with the trial, and the same is adopted by the Division, they shall proceed with the trial. If the Committee reports sufficient reasons for proceeding with trial and same is rejected by the Division, that shall end the proceedings unless charges are renewed.

* * *

*563 TAKING CASE TO COURT.
Sec. 93. Any member or members of the Brotherhood who submit, or appeal, any case in controversy arising within the Organization, and for which the laws of the Brotherhood provide a means of settlement, to the judges of the civil courts, the governors of state or others not identified with the B. of L.E. in official capacity, for opinion or decision, without having previously exhausted all his remedies within the Brotherhood, shall be deemed guilty of disloyalty, and upon conviction shall be expelled; and any Division convicted of a similar offense shall have its Charter suspended by the Grand Chief Engineer."

STANDING RULES.

"ACCIDENTS  GRIEVANCES.
Sec. 48(c). Each and every member of the Brotherhood of Locomotive Engineers grants to the duly authorized representative and/or representatives of the Brotherhood (which includes Divisions, Local Chairmen and/or Local Committees, General Chairmen and/or General Committees, Assistant Grand Chief Engineers and/or the Grand Chief Engineer) full and complete authority to present and handle each and every member's claims, complaints, and grievances against the railroad on which he is employed. Said power and authority shall include the handling of such claims, complaints and grievances, before any and all officials of the railroad, and shall include the right to collect, settle, compromise, amend, withdraw, dismiss, or in any other manner dispose of, such claims, complaints, and/or grievances, and shall also include the power and authority to submit such claims, complaints, and grievances, for determination to any person, court, or board or other tribunal provided by law or otherwise as may be deemed necessary or advisable by such authorized representatives.
The foregoing will in no wise conflict with other provisions of the Constitution and By-laws of the Grand International Division of the Brotherhood of Locomotive Engineers which stipulate the procedure and sequence to be followed by Divisions, Local Chairmen and/or Local Committees, General Chairmen and/or General Committees and other duly authorized representatives of the Brotherhood of Locomotive Engineers, in handling claims and grievances of members."
It might be well to set forth here what is known as the Philbrook Resolution, adopted by the General Committee of Adjustment, and which is as follows:
"Resolved, that when the General Chairman, or his Representative, negotiates an agreement the Local Chairman or Local Chairmen on the seniority district or seniority districts affected, must be consulted *564 and no agreement shall be made without the approval in writing from the Local Chairman or Local Chairmen of the affected seniority district or seniority districts."
On April 23, 1951 the Division decided to settle the long outstanding claims of its members against the Pennsylvania Railroad on the same basis that the Trainmen's and Firemen's Brotherhoods had settled theirs, and it directed Naylor, who was chairman of the Local Committee of Adjustment and was known as the local chairman, to take the necessary steps to that end and to report at the meeting to be held on May 7, 1951. (This motion was rescinded at a meeting of the Division on June 11, 1951.) Edward Menges, who was chairman of the General Committee of Adjustment, was notified of this. The latter initiated proceedings with representatives of the railroad and as a result of which certain papers were to be prepared for the signature, among others, of Naylor. The latter gave notice that he would not approve of the settlement, relying on his authority under the Philbrook Resolution. On May 3, 1951 Naylor, individually and as trustee for certain members of the Division, instituted the action against the Pennsylvania Railroad in the United States District Court to restrain it from entering into any agreement for the settlement of the wage claims of the members of the Division without his written approval, and for the recovery of the wages due the persons he represented. Naylor has contended that he was justified in bringing this action under section 48(c) of the Standing Rules of the Brotherhood. The Brotherhood on its application was admitted as a defendant in that action which, it may be said, was dismissed conditionally before trial.
The conduct of Naylor in resisting the settlement of the wage claims in accordance with the direction given by the Division on April 23 and in instituting the action in the District Court precipitated swift retaliation by certain officers and members of the Brotherhood and the Division. J.P. Shields, Grand Chief Engineer, who was the chief executive officer of the Brotherhood, participated in direct and telephonic conversations with officers of the Division during the *565 period of a few days preceding May 14, 1951. On the evening of that day, at a meeting held by the Division, charges in writing by J.E. Jefferson, a member of the Division, against Naylor under sections 19 and 93 of the Statutes were presented. These were in the form of a letter addressed by him to the secretary-treasurer of the local under date May 12, 1951. The minutes of that meeting disclose that a committee of three was appointed by Chief Engineer Long to investigate the charges and that upon the findings of the committee, which are not stated, Long "removed the Local Chairman temporarily from office subject to his trial and disposition of his case." It is observed from these minutes that the Division took no action whatever on the charges. The only action was taken by the presiding officer and this at the meeting to which the charges were first presented. It was a plain violation of section 72 of the Statutes.
The following day in the City of Washington, Shields, sua sponte, rescinded this action. It seems remarkable that he was so soon aware of what had taken place the night before in Philadelphia. However, when we look at the following telegram which Shields had dispatched to Long on May 14, 1951, we can appreciate that Shields was not only well aware of what was going on as regards Naylor, but that he had dispatched this telegram having in mind that charges were about to be preferred against Naylor.
"Re our telephone conversation in connection with charges which may be preferred against Brother Naylor; after charges are preferred against a member and the investigating committee has furnished him with a copy of the charges and notified him to appear for trial, he is theoretically under arrest and is deprived of all rights of membership until his case is disposed of, in which case the Chief Engineer will appoint a qualified member to take over the duties of the office until results of trial are available "
Shields informed Long at once that he had improperly suspended Naylor; that under section 72 the investigating committee could not report until the next regular meeting and that in the meantime a copy of the charges would have to be served upon Naylor and notice given to him of the time *566 fixed for hearing thereon. It so happened that Naylor was present at the meeting of May 14, but nothing had been served upon him in advance thereof. However, on that date he received a notice from the committee that he would be tried at the following meeting on May 28.
On May 15, 1951 Shields sent the following telegram to Long:
"I want you to comply literally with the provisions of my telegram of fourteenth you are not relieve Naylor until after charges have been preferred investigating committee has furnished Naylor with copy of the charges and notified Naylor to appear for trial."
Although Shields was the chief quasi-judicial officer of the Brotherhood as well as the chief executive officer, it would appear that his communications up to this time were in his character of executive. His telegrams of May 14 and May 15 are definitely related to his prior conversations with Long with respect to the filing of charges against Naylor. Following this, Naylor was restored to his office but further charges were filed against him by Jefferson. These are similar to the former charges, but are set forth in two separate communications to the secretary-treasurer. This time Long followed proper procedure. A committee was appointed to investigate and its report was made, a copy of the charges was served upon Naylor and he was notified that a hearing would be held at the June 25 meeting. In the meantime Long placed Naylor "under technical arrest until such time as the trial is held and the charges disposed of." At the June 25 meeting, the defendant Harkins presided in the place of Long. Harkins as Assistant Grand Chief Engineer had the right to assume the chair on visiting a Division. However, he had been directed by Shields to attend and preside at this meeting. There was no trial in the accepted sense. After reading the report of the committee Harkins ruled "out of order" the charges under section 19 and stated that he found evidence to substantiate the charges under section 93. There was a debate upon the report of the investigating committee. The members of the committee spoke in support of it; Naylor and many others spoke against it. There *567 was no vote on the guilt or innocence of Naylor. The only question was whether the report should be adopted and the matter proceed to trial in accordance with section 73 (b) of the Statutes. The minutes of the meeting contain this entry:
"When the vote was taken it was found that there were 44 votes against accepting the report of the investigating committee and 9 in favor of accepting the report as submitted."
Following this meeting, Harkins made a report in writing to Shields, and with this before him the latter on July 5, 1951 addressed a lengthy communication to Long as Chief Engineer of the Division. In it he stated he was at a loss to understand how the members of the Division "can justify their action in completely ignoring the incontrovertible evidence of Brother Naylor's guilt." He then discussed the charges, section 93 of the Statutes and the evidence, and concluded that if the action of the Division was not "corrected in accordance with the directions to reconsider, to convict and to expel, contained in this letter, it will constitute violation of Section 93 of the Statutes by the Division itself through condonation and support of violation thereof by Brother Arthur F. Naylor, as well as violation by the Division of a proper direction issued by the Grand Chief Engineer pursuant to and in accordance with Section 6 (c), Constitution." He then stated that he set aside the "verdict" of the Division and directed that it give further consideration to the matter at its next meeting on July 9, 1951. He directed that unless Naylor was found guilty of disloyalty and expelled from the Brotherhood by July 23, its charter would be suspended.
At the Division meeting on July 9, 1951 a motion was made and carried that the above letter of Shields "be rejected by Division action due to the misstatement of facts contained therein." Harkins was present at the meeting hall on July 23, the date of the next regular meeting, obviously to see that action was taken on Shields' letter of July 5. However, he determined the meeting should not be held because an injunction had been served upon him in this matter.
*568 On August 8, Shields addressed a letter to the officers and members of the Division, in which he recited that the ultimatum that he had given in his July 5 letter had not been carried out on or before July 23, the deadline set by him, and stated he would not suspend the charter provided the Division took the required action of expelling Naylor at the meeting to be held on August 13. He threatened that if this were not done the suspension of the Division would automatically follow. His specific direction is as follows:
"With the concurrence of the Advisory Board under Section 6(c), Constitution, I have previously directed and now direct Division 851 to give effect to Section 93 of the Statutes, to find Brother Arthur F. Naylor guilty of disloyalty thereunder, and for such conviction expel Brother Arthur F. Naylor from this Brotherhood."
At the meeting held on August 13 Shields' letter of August 8 was referred to but was not read aloud at the meeting and no action was taken pursuant thereto.
On August 14, 1951 Shields addressed a letter to Naylor, which counsel for the defendants on the argument considered was the final judgment in the case. Pertinent parts of it are as follows:
"I hereby find you guilty of repeated, continued and persistent violation of the Constitution, By-Laws, Ritual and Convention Resolutions of the Brotherhood, and thus guilty of disloyalty to the Brotherhood, and also thus guilty of refusal to carry out requirements of the said Constitution and By-Laws.
On account thereof I hereby remove you from any and all offices of the Brotherhood or any and all of its subdivisions, and I hereby expel you from membership in the Brotherhood, which action will stand, subject to appeal in accordance with the laws of the Brotherhood."
It should be observed here that Naylor was never charged with the matters of which Shields found him guilty. There were two charges against him, and after one was dismissed by Assistant Grand Chief Engineer Harkins, the only remaining one was that he violated section 93 of the Statutes by instituting an action against the Pennsylvania Railroad in the U.S. District Court.
*569 On the same day Shields addressed another letter to the former officers and members of the Division, in which he stated that it had become "so demoralized as to constitute and be a detriment to the Brotherhood and accordingly I hereby exercise my authority to revoke the Charter of Division 851, pending action of the next Convention of the G.I.D."
The Division never had a hearing before its charter was revoked; what the demoralization was does not appear; obviously Shields held it to be its failure to convict and expel Naylor as ordered by him.
In his testimony Shields stated that as soon as he was convinced that Naylor had instituted the District Court action, he was satisfied he had violated section 93 of the Statutes. Against this, Naylor insisted that he had the right to bring the action under section 48 (c) of the Standing Rules. He insisted also that he had rights under the Philbrook Resolution, which it might be observed here Shields annulled by a declaration made by him on May 14, 1951, acting under his authority in section 6 (b) of the Constitution to "interpret the law of the G.I.D. according to its plain and obvious meaning." He held that this resolution "contravened the G.I.D. law and is therefore null and void."
Section 6 (c) of the Constitution clearly provides that before the Grand Chief Engineer, with the concurrence of the Advisory Board, has the power to set aside a verdict and direct a verdict in place of it and impose a penalty, there must have first been two trials in the Division. The procedure is that if it is apparent to him from the records that the first trial was not "conducted or disposed of in accordance with the law and evidence, he shall have the power to order a new trial and direct that a complete record of it be kept for his information." It is upon the record in the second trial that he may, with the concurrence of the Advisory Board, set a verdict aside, direct a new one and fix a penalty.
It is apparent from what it set forth above that Naylor had no trial on May 14. Any trial of him on that date would have been contrary to the law of the organization, but in *570 fact no trial was even attempted. No action was taken by the Division. The only action taken was by the presiding officer who removed Naylor "temporarily from office subject to his trial and disposition of his case." It is just not possible to designate what occurred at the May 14 meeting a trial. At most it was a procedural step. The temporary suspension of Naylor was improper and Shields rectified that on the following day. No one on either side, at the time, regarded the May 14 meeting as a trial because on that very date the investigating committee gave notice in writing to Naylor that he was to appear at the following meeting, namely May 28, for trial. It is hardly possible to believe that Shields was acting in his quasi-judicial capacity on May 15 when he advised Long that he had committed an error. Obviously he was speaking then as the chief executive officer who had participated in the discussions leading up to the filing of charges against Naylor.
When we come to the June 25 meeting it is somewhat different. Naylor was notified to appear at that time for trial and he had been served with the charges, but at that meeting no evidence was taken in the ordinary sense. There was an extended debate. No action was taken by the Division on the guilt or innocence of Naylor. What happened was that, as stated above, the report of the investigating committee was rejected. If it had been adopted, then under section 73 (b) of the Statutes "they shall proceed with the trial."
We agree with the trial court that a trial before a union tribunal "need not be conducted with the formality and established precision of our public courts." Dragwa v. Federal Labor Union No. 23070, 136 N.J. Eq. 172, 174 (Ch. 1945). However, even if it be conceded that there was a trial on June 25, that was the first trial, and there having been no second trial pursuant to the order of the Grand Chief Engineer, he lacked the jurisdiction to take the action which he did on August 14 in expelling Naylor.
The court below did not specifically pass on the question as to whether or not the institution of the District Court action by Naylor constituted a violation of section 93 of the *571 Statutes. The Brotherhood might very well have had a statute expressly prohibiting a member from bringing a suit of that nature against a carrier, as Naylor did here.
We are of the opinion that the trial court correctly stated the law with respect to the intervention of the courts for the purpose of reviewing the procedural action of an association, such as the Brotherhood, in relation to its subordinate bodies and its individual members in matters of discipline. Cf. Zeliff v. Grand Lodge of New Jersey Knights of Pythias, 53 N.J.L. 536 (Sup. Ct. 1891); Dragwa v. Federal Labor Union No. 23070, supra; Barnhart v. United Automobile, etc., Local 669, 12 N.J. Super. 147 (App. Div. 1951); 7 C.J.S., Associations, § 34. However we are constrained to conclude that there was error in the application of the law to the facts in the case.
Inasmuch as the Division was expelled solely because of its failure to carry out the mandate of Shields to expel Naylor, which would have been an illegal act under the circumstances, we find that there was no justification whatsoever for revoking the charter of the Division on the ground that it was demoralized. While we find it unnecessary to pass upon it, it may be that the Division under the requirements of natural justice would have the right to notice and hearing before the revocation of its charter. These were not accorded it.
We are of the opinion that there is error in the judgment in so far as it dismisses the claim of Naylor for reinstatement as a member of the Brotherhood and an officer of his Division; he is entitled to that relief, but without prejudice to further proceedings under the Constitution, Statutes and rules of the Brotherhood.
A reading of the record indicates that Naylor had a strong conviction that certain of the members of his Division had very substantial and valid claims against their employer for additional wages extending back eight or ten years and that he would not compromise them but rather sought to recover the maximum upon them. On the other hand, it would appear that the Grand International Division regarded these *572 claims as having "a dubious basis in a court of law." It thought, too, that the claims were for penalties rather than for additional wages. It did not favor a suit such as Naylor brought because such a suit "by inviting the possibility of a complete denial of any recovery not only jeopardized all the claims held by engineers but also risked an adverse precedent which might harm the Brotherhood and other labor organizations in their prosecution of other claims." Shields in all his actions in this matter appears to have been concerned about the cohesiveness of his union, the maintenance of discipline, the establishing of a reputation for living up to contracts, and the desire to further good everyday relations with the carriers, while asserting and defending the rights of his members. From the evidence there can be no doubt that Shields was the master mind in the institution of the charges against Naylor. He and Naylor seem to be men of strong convictions who were ready to fight for them. Each was a leader contending for what he thought was right; both were zealous and persistent. Considered in this background, it is our conclusion that Shields and his associates did not properly apply the procedural laws of their own organization, but their conduct though wrong, was not inspired by, or done in, malice.
We agree with the trial court that there was no proof of malice or of a conspiracy between the railroad on the one hand and the Brotherhood and its officials on the other hand to undermine Naylor and defeat the claims of those for whom he was acting.
The judgment is affirmed as regards the dismissal as to Harkins, there being no basis for relief against him individually, but is otherwise reversed; and the matter is remanded with the direction that judgment be entered restoring the charter of the Division, reinstating Naylor as a member and officer of the Division, and for assessing any compensatory damages and awarding any other relief to which the plaintiffs may be entitled.