66 N.J. Super. 231 (1961)
168 A.2d 829
BOARD OF EDUCATION OF THE CITY OF ASBURY PARK, A MUNICIPAL CORPORATION, PLAINTIFF-RESPONDENT,
v.
FLOYD G. HOEK, DEFENDANT-APPELLANT, AND CARROLL MATTHEWS T/A FRANK MATTHEWS COMPANY, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued March 6, 1961.
Decided March 16, 1961.
*233 Before Judges GOLDMANN, FOLEY and LEWIS.
Mr. Edward W. Currie argued the cause for appellant.
Mr. Joseph N. Dempsey argued the cause for respondent.
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiff board of education sued to recover the profit made by defendant Matthews, a carpenter contractor, on certain executed contracts for work performed in Asbury Park schools from 1952 to 1958. *234 Defendant Hoek was plaintiff's business manager during that period. The jury returned a verdict for plaintiff in the sum of $10,292.98, less the $1,750 which defendant Matthews had paid the board for his release from the case, leaving a net of $8,542.98 upon which judgment was entered.
Hoek moved for a new trial on a number of grounds, among them that the verdict was excessive and against the weight of the evidence; it was erroneous because it included damages assessed upon contracts which did not involve repairs to a schoolhouse or where the cost of repairs could not be separated from other items; the court had erroneously charged that Hoek was entitled to a credit of $1,750, whereas he should have been credited with half the amount of the verdict; the trial court denied his motion for judgment; and the court refused to charge some 18 requests, among them a definition of the word "repair." The motion was denied. However, the court entered an order correcting the judgment to read $10,292.98, the clerk to mark the judgment satisfied as to 50% thereof. Hoek appeals the whole of the judgment.
The case presents areas of confusion which make appellate review extremely difficult. The pleadings and pretrial order do not clearly define the issues, but tend to becloud them. The testimony deals with many hundreds of contracts performed by Matthews over the years, and the procedures followed by plaintiff board (with its shifting membership during the period in question), its building and finance committees, and defendant Hoek, in connection with such contracts. The instructions given the jurors must have been confusing to their lay minds. The special verdict is ambiguous, and the basis for the amount of damages awarded indeterminable.
The pretrial order is imprecise, but it is possible to spell out three contentions on plaintiff's part: (1) Matthews fraudulently concealed the amount of his profit, which should have been 10% of actual cost, so that he received 15% and 20%; and Hoek conspired with him to conceal these overcharges by his monthly submission of *235 vouchers to plaintiff board accompanied by representations that they were approved for payment and in good order; (2) defendants conspired to split the contracts awarded Matthews into amounts of less than $1,000 so as to avoid the requirement of N.J.S.A. 18:6-25 (as it read during the period in question) that contracts "for the repairing of an existing schoolhouse at a cost of more than $1,000.00" be let on bids after advertising; and (3) Hoek was guilty of misconduct in office under R.S. 18:6-47 (relating to a business manager's duties respecting construction and repairs of schoolhouses, plans and specifications therefor, advertising for bids, etc.) by failing to advertise for bids on the work done by Matthews, and in concealing from plaintiff board the fact that the work exceeded $1,000. (This last-mentioned claim relates to N.J.S.A. 18:6-34 which, it is alleged, required Hoek, as general accountant of the board of education, to examine and audit all accounts and demands against the board.)
Plaintiff does not contend that the work called for by the contracts was not done, or that any of it was unsatisfactory, or that Hoek personally received any part of the profits. Assessing the testimony as it developed in the course of the 18-day trial, it appears that plaintiff sought to establish its claim to damages on two theories: (1) the contracts were illegal because of a conspiracy to avoid the bidding statute (N.J.S.A. 18:6-25), or because of Hoek's violation of his statutory duty (R.S. 18:6-47), and therefore defendants were jointly liable for all the profits made on the contracts; and (2) even if the contracts were legal, defendants were liable because of their conspiring to obtain for Matthews profits above the 10% of actual cost authorized by plaintiff board.
The trial judge first read to the jury the statutes on which plaintiff relied, N.J.S.A. 18:6-25, 34 and 47. After charging that contracts for repairs to an existing schoolhouse exceeding $1,000 may not be entered into without first advertising for bids, he proceeded to state generally the law applicable *236 in a civil action for conspiracy. The effect of this was to direct the jury's mind to plaintiff's claim of a conspiracy in splitting contracts.
The jury was next instructed to determine whether the contracts were legal or illegal. At this point the trial judge, in effect, called for the return of a special verdict:
"The Court directs you that you announce on the return of your verdict, if you should determine the contracts are illegal, whether it is by reason of the conspiracy between Hoek and Matthews, or as the result of Hoek's violation of his statutory duties."
Although Hoek's statutory duties were not specified, the obvious reference was to his duty to advertise for all repair work over $1,000.
Special verdicts have a practical value. They enable the reviewing court to localize errors, so that the sound portions of the verdicts may be saved and a retrial of all issues obviated. Terminal Construction Corp. v. Bergen County, etc., Sewer District Authority, 18 N.J. 294, 319 (1955); Marchese v. Monaco, 52 N.J. Super. 474, 485 (App. Div. 1958), certification denied 28 N.J. 565 (1959); and see 11 Rutgers L. Rev. 385 (1956). In this case there was a further reason for a special verdict  to determine whether the jury found Hoek individually liable for splitting the contracts, or jointly with Matthews because of a conspiracy. In the former case Hoek would not be entitled to have any judgment against him satisfied to the extent of 50% because of plaintiff's settlement with Matthews. See Oliver v. Russo, 29 N.J. 418 (1959).
The use of a special verdict lies within the trial court's discretion. Middlesex Concrete, etc., Corp. v. Carteret, 35 N.J. Super. 226, 241 (App. Div. 1955). The procedure is governed by R.R. 4:50-1:
"The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit *237 written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. * * *"
Unfortunately, the trial judge did not follow the salutary procedure outlined by the rule. Instead, he gave the oral instruction quoted above. At that point in the charge he had as yet made no mention of plaintiff's claim of profit overcharges. The jury was therefore without instruction to bring in a special verdict with regard to the alleged conspiracy to overcharge.
Having called for a special verdict the judge charged as to the measure of damages if the jury found the contracts illegal, either because of Hoek's failure to discharge his statutory duties or a conspiracy to avoid the bidding statute. In such case, the damages were to be assessed in the amount of all profits received as a result of the illegality, less the $1,750 paid by Matthews to be released from the case. The court, of course, was in error in charging that if defendants were found jointly liable, Hoek would be entitled to only a $1,750 reduction in the verdict, rather than a full 50%. This error, as already mentioned, was later corrected when the court reformed its judgment.
The trial judge next instructed the jury as to plaintiff's theory of overcharges in profits. We find this part of the charge unclear and confusing in the light of the pleadings, pretrial order and testimony. Plaintiff had sought to recover the specific total of $6,437.75 in profit overcharges from (1) Matthews, who was charged with purposely concealing the increase in profits; or (2) Hoek, for breach of his statutory duty or concealment; or (3) both, because of their conspiracy. (Other counts sought to recover $30,000 from either or both, for the same reasons, for unauthorized profits and other overcharges.)
*238 The instructions on this phase of the case were:
"Plaintiff on its claim for overcharges on the contracts has indicated by vouchers in the folders by fiscal years, [sic] would only be entitled to the amount of profit found by you to be charged over ten per cent on these vouchers. You would not consider the vouchers in the groups of P-28 to P-51,[*] if you have already awarded damages on the conspiracy theory.
With regard to the claim of improper charges under the illegal contracts, if you so find, and if you find that payments resulted in overcharges, and you further find that the plaintiff directed the defendant Hoek to have Matthews charge his actual cost plus ten percent, and that Hoek so informed Matthews, any charges over and above this formula would be excessive, and here again, should these excesses be determined by you to be the result of Hoek's improper examination of the vouchers and failure to properly notify the Board that they were in excess of the agreed amount, the plaintiff would be entitled to a return of all profits received by Matthews which exceeded the agreed cost plus ten percent.
Of course, here again, should you find against the defendant Hoek, he would be entitled to have deducted from such amount the sum of $1,750.00 heretofore received by the plaintiff from the released defendant, Matthews."
The first sentence of the charge mixes contracts that might otherwise be found legal (in which case only profits above 10% would be recoverable) with those found illegal because of a conspiracy to split contracts or Hoek's breach of statutory duty in that regard. The second paragraph refers to "improper charges under the illegal contracts" resulting in overcharges. Here the damages were to be the profits in excess of 10%. This is clearly contradictory to instructions previously given that all profits were recoverable if the contracts were found illegal. The third paragraph is obviously based on an unspoken assumption that there was a conspiracy and that defendants were joint tortfeasors, because the judge directs (again mistakenly) that Hoek be given a $1,750 credit.
*239 We note particularly that in the instructions just quoted "conspiracy" is never once mentioned in connection with overcharges. Indeed, the implication left with the jury was that no conspiracy existed in this respect, since the trial judge spoke of the "conspiracy theory" in referring to Exhibits P-28 to P-51, which dealt with split contracts only.
In the light of this part of the charge, could any jury be sure whether the court had instructed it as to plaintiff's claim of a conspiracy to overcharge? We think not, and we find no other instruction which exposed such a claim to the jury in clear and unmistakable terms. If anything may reasonably be said, it is this  that the jury could possibly have been led to believe that contracts which had nothing more wrong with them than a profit item exceeding 10% of actual cost were illegal. This, of course, is not so.
Nor was the jury helped when the court repeated its charge as to a special verdict. The jury had retired while counsel made their exceptions to the charge as given and failure to charge as requested. When the jury returned, the trial judge said:
"While I have you here, one further instruction, may I direct your attention that under the Charge as the Court gave it to you it requires that you return a special verdict as to the contracts, as to whether or not they are legal or illegal and I think the Court stated to you the basis upon which you should state whether or not it is the result of conspiracy or as the result of the failure of the statutory duty. I don't want you to forget that or overlook it."
The jury retired  presumably with an adding machine which they had requested  and returned in 55 minutes. The trial judge then asked the forelady:
"May I ask you to state your determination as to the legality or illegality of the contracts?"
She replied:
"We find the contracts to be illegal on the grounds of conspiracy."
*240 The verdict returned was $10,292.98 less $1,750, or $8,542.98.
It is difficult to determine just how the jury arrived at its $10,292.98 figure. The total amount of profits on the allegedly illegal (split) contracts (Exhibits P-28 to P-51) was $7,801.53, at a maximum. A possible explanation  although this is speculative  is that the jury awarded damages in the amount of all the profits on those contracts and then added some of the profits which exceeded 10% of actual cost. We find the verdict excessive under any theory of the case. Its amount coincides with none of the theories plaintiff advanced, nor can it be derived from any perceivable combination of figures. The verdict evidences the state of confusion in which the jury must have found itself.
The special verdict whereby the jury found the contracts "illegal on the grounds of conspiracy" definitely eliminates any possibility that damages were awarded on the basis of Hoek's violation of his statutory duties, under either N.J.S.A. 18:6-34 or R.S. 18:6-47, so as to make him individually liable. The $1,750 credit allowed Hoek pursuant to the erroneous instruction of the court clearly points to a finding of joint liability. In the light of the court's charge, where the only conspiracy clearly set out was one to split contracts, the jury's reference to "conspiracy" could only mean a conspiracy to avoid the bidding statute. The other possible conspiracy, to conceal overcharges in profits, was so adumbrated  in fact, it was never specifically mentioned by the trial judge  as not to have been brought home to the jury.
Was there a conspiracy to split the contracts so as to avoid the bidding statute, N.J.S.A. 18:6-25? A resolution of this question makes unnecessary any consideration of other grounds of appeal raised by defendant Hoek.
It is well to bear in mind the distinction between criminal conspiracy and civil conspiracy. In the criminal law, conspiracy  an unlawful confederation  is itself a *241 crime, standing apart from the substantive offense which results from it. Thus, one may be convicted of both the conspiracy and the substantive offense. But civilly the conspiracy is not the gravamen of the charge, but merely a matter of aggravation, enabling the plaintiff to recover against all the defendants as joint tortfeasors. The actionable element is the tort which the defendants agreed to perpetrate, and which they actually committed. Landriani v. Lake Mohawk Country Club, 26 N.J. Super. 157, 159 (App. Div. 1953).
The essential elements of a conspiracy are: (1) a combination of two or more persons; (2) a real agreement or confederation with a common design; and (3) existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful means. The elements of both the criminal offense of conspiracy and the so-called "civil conspiracy" are identical, except that in order to recover for the latter a plaintiff must prove, in addition to the component parts of the offense, special damages. Naylor v. Harkins, 27 N.J. Super. 594, 604 (Ch. Div. 1953), modified 32 N.J. Super. 559 (App. Div. 1954).
As was said in Farbenfabriken Bayer, A.G. v. Sterling Drug, 153 F. Supp. 589, 592-593 (D.C.D.N.J. 1957), a civil action for conspiracy is essentially one in tort. Such an action cannot be maintained in the absence of, first, the overt act of one or more of the conspirators in furtherance of the conspiracy, and second, the consequential damage to the rights of another, of which the overt act is the proximate cause. A conspiracy cannot be the subject of a civil action unless something is done which, without the conspiracy, would give a right of action. Kurtz v. Oremland, 33 N.J. Super. 443, 456 (App. Div. 1954), affirmed 16 N.J. 454 (1954), where it was emphasized that the damage is the essence of the action, not the conspiracy.
Plaintiff's entire case rested on the testimony of two witnesses, board members Novogrod and Peluso. The *242 testimony of these two was devoted almost exclusively to explaining the documentary evidence submitted, most of it consisting of vouchers for the work done by Matthews and which were paid by the board without objection. Novogrod, who is an attorney, stated that the majority of the board had approved the practice of awarding contracts to Matthews without bidding, throughout the entire period of years involved. He further testified that after discussion among the board members, Hoek had been instructed that the amount to be charged by Matthews was 10% above actual cost. Novogrod said that the vouchers were submitted to the board every month with a certification by Hoek that they were in good order. According to him, Hoek would justify the non-bidding of the contracts represented by the vouchers on the grounds that emergencies had arisen and since the jobs were under $1,000, they would not have to be bid. He also testified that Mr. Farmer, an architect, then president of the board and chairman of the finance and building committees, justified the non-bidding on the grounds that the work was of a specialized kind not requiring bidding or was an emergency. It would appear that Farmer took a deep interest in his board and committee work, and closely checked contracts like those given Matthews.
Novogrod specifically stated that he had no knowledge about the contracts other than from reading the vouchers. He knew nothing of what happened between Hoek and Matthews. He had no knowledge as to when the contracts were let, how they were negotiated, or anything else of that nature. Peluso's testimony was much the same as Novogrod's. Essentially, he explained the vouchers and stated that Hoek believed the contracts did not have to be bid because they were for jobs less than $1,000.
It was plaintiff's burden to prove a conspiracy before it could hold Hoek jointly responsible with Matthews. Plaintiff's proofs establish that it was the policy of the board to let the carpentry contracts without bidding, and *243 the board approved them for payment despite the opposition of Novogrod and Peluso. Incidentally, neither of them ever objected to the board's procedure on the ground that there was any conspiracy between defendants, or that the contracts were being split, or that the board's acts were illegal. The only basis for their objection was that bidding would possibly secure lower prices. (In this connection, the testimony indicates that Hoek on a number of occasions got Matthews to reduce the cost of a job below his estimate.) Neither ever so much as accused defendants of splitting contracts, with or without an agreement to do so. Nor was either of the witnesses questioned about the dividing of contracts. It was Peluso who moved 36 and seconded 4 of the 53 resolutions passed by the board to pay the contracts in question. Novogrod moved 8 and seconded 17. Plaintiff also established that the board of education chose the contractors for its work and directed Hoek to give it to them. Matthews was chosen for the carpentry work in this fashion.
Our careful reading of the record leads to the conclusion that the proofs do not support a case of conspiracy to avoid the bidding statute. There was no direct proof of conspiracy, nor is conspiracy spelled out by circumstantial evidence.
To infer a conspiracy in the light of the proofs would be to engage in pure speculation. Guess or conjecture is no substitute for legal proof. Joseph v. Passaic Hospital Ass'n, 26 N.J. 557, 574-575 (1958). We conclude that plaintiff did not prove its claim that defendants had conspired to split contracts.
But there is a more fundamental weakness to plaintiff's case. The board of education has in its charge three elementary schools and a high school in Asbury Park. To establish a conspiracy to avoid the bidding statute by splitting contracts, plaintiff grouped Matthews' contracts for carpentry work in the several schools into the exhibits already mentioned, P-28 to P-51. These comprise about *244 250 vouchers submitted during the six-year period involved in this action, each for less than $1,000. It must be remembered that it was the board that hired Matthews; the work was let without bidding, and this under an approved policy of the board; the building and finance committees headed by Farmer reviewed and approved the bills submitted by Matthews; and finally, the board approved the bills after Hoek had represented they were in good order.
The statute, N.J.S.A. 18:6-25, requires advertising for bids in the case of any contract "for the repairing of an existing schoolhouse," where the cost is more than $1,000 (now $2,000 by virtue of L. 1957, c. 174). Not only did the proofs fail to establish that Matthews and Hoek had split the contracts pursuant to a conspiracy, but the statute itself did not require that the items covered by the contracts in the P-28 to P-51 series of exhibits be advertised and bid.
"Repair" has been defined as "To restore to a sound or good state after decay, injury, dilapidation, or partial destruction." Webster's New International Dictionary (2d ed. 1943). It is work done on an existing structure or thing which has become imperfect by reason of the action of the elements or otherwise; something the condition of which has been affected by decay, waste, injury, or partial destruction. See Grady v. National Conduit & Cable Co., 153 App. Div. 401, 138 N.Y.S. 549, 553 (App. Div. 1915); 76 C.J.S. Repair, p. 1170 (1952). (Incidentally, the trial court did not seem to be concerned with the meaning of "repair" for it refused defendant's request to instruct the jury on that point. It was essential that the jurors, in considering whether the work done under exhibits P-28 to P-51 involved "repairing of an existing schoolhouse," understand the distinction between repairs and alterations or improvements of the kind Matthews made. The jury was thus left to its own individual conception of the word.)
*245 Plaintiff argues that work of the kind covered by exhibits P-28 to P-51 does not have "such distinction in the educational process as to permit its exclusion from public advertising." This is an over-refinement which offends common sense. "Repair" should not be given a technical or strained interpretation. Heart of America Lumber Co. v. Belove, 111 F.2d 535, 539, 130 A.L.R. 658 (8 Cir. 1940). There is no reason to believe that the Legislature used the word in other than its ordinary sense. See State v. Joas, 34 N.J. 179, 187 (1961). Likewise, there is no reason why defendant should have been expected to attribute to the word the extraordinary meaning for which plaintiff contends.
We have reviewed exhibits P-28 to P-51 and find that except for minor instances the contracts did not involve repairs to existing schoolhouses. In the case of P-28, carpentry work was done under a stadium to supply storage space and a garage. Elsewhere in Title 18, chapter 6, the Legislature has referred to "public school property," e.g., R.S. 18:6-18 and 19, or "property for school purposes," N.J.S.A. 18:6-24. But in sections 18:6-25 and 26, it uses the more specific and restricted term, "schoolhouse." A stadium does not fall within the category of "schoolhouse" insofar as the repair provision of N.J.S.A. 18:6-25 is concerned. In any event, the work done under the stadium was not repairing, but new work.
The other exhibits in the P-28 to P-51 series cover such work as providing new storage cabinets, closets, bookcases, shelving, trophy cases, blackboards, a kindergarten playhouse, bulletin boards, equipment, and the like. None falls within the ambit of repair to a schoolhouse. The repair items in any one of these groups of contracts were minor. In some cases they were so intermingled with the other items as to be unidentifiable as repairs. Moreover, in no case does it appear that they exceeded $1,000.
We conclude that none of the contracts included in the P-28 to P-51 series was such as required advertising and bidding. There was no violation of the bidding statute. It *246 follows that there could not possibly have been a conspiracy with regard to them. Accordingly, the charge of conspiracy to split contracts falls by the very weight of the exhibits which plaintiff introduced in evidence.
Defendant moved for judgment at the close of the case. The proofs then were such that the court should have granted the motion insofar as the claim based on conspiracy to split contracts in violation of the statute was concerned. The verdict was clearly based upon that conspiracy and therefore cannot stand. Since the jury did not award damages on the basis of defendant Hoek's individual liability for breach of his duty as business manager under N.J.S.A. 18:6-34 or 47, nothing remains of the case.
The judgment under review is reversed and the matter remanded for entry of judgment in favor of defendant Hoek. Costs to defendant Hoek.
NOTES
[*] To establish a conspiracy to avoid the bidding statute, plaintiff grouped a large number of contracts into exhibits P-28 to P-51. These were claimed to be split contracts violating the bidding statute.