52 N.J. Super. 474 (1958)
145 A.2d 809
WILLIAM MARCHESE, PLAINTIFF-RESPONDENT,
v.
DANTE L. MONACO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 22, 1958.
Decided November 10, 1958.
*477 Before Judges PRICE, HALL and GAULKIN.
*478 Mr. Samuel A. Larner argued the cause for plaintiff-respondent (Messrs. Marinello, Cundari & Soriano, attorneys).
Mr. Roger H. McGlynn argued the cause for defendant-appellant (Messrs. Braun & Hoey, attorneys; Mr. William P. Braun and Messrs. McGlynn, Stein and McGlynn, of counsel).
The opinion of the court was delivered by GAULKIN, J.A.D.
Defendant appeals from a judgment entered upon the verdict of a jury. Plaintiff sues defendant doctor, a general practitioner, alleging that he negligently treated him with injections of a drug called mycifradin sulfate (hereafter called mycifradin) as a result of which he became deaf. The jury returned a verdict of $56,000. Defendant's motion for a new trial was denied.
A principal ground of appeal is that defendant's motions for judgment at the end of the plaintiff's case and after both sides had rested should have been granted. The motion for a new trial on the ground that the verdict was against the weight of the evidence insofar as it determined liability, was based on substantially the same grounds as the motions for judgment. Therefore, we will deal with the appeal from the denial of all these motions at the same time. We will deal with these questions first because their discussion and decision will facilitate the disposition of the remaining grounds of appeal.
In the review of a civil action (even to decide whether the denial of the motion for judgment at the end of the plaintiff's case was error) we consider all of the competent and relevant testimony introduced during the entire trial. Falk v. Unger, 33 N.J. Super. 589, 592 (App. Div. 1955). And here, when we view plaintiff's evidence as true and draw therefrom every legitimate inference of fact favorable to the plaintiff (as we must upon motions for dismissal, Melone v. Jersey Central Power & Light Co., 18 N.J. 163, 170 (1955)), we find that it shows the following:
*479 Mycifradin is the trade name of a particular brand of neomycin, an antibiotic. The carton in which defendant received it had printed on it the following:
"Warning  Intramuscular injections of this drug should be given only for treating serious systemic infections caused by gram-positive or gram-negative organisms that are resistant to antibiotics that are less toxic parenterally. To assure constant medical supervision, intramuscular administration should be restricted to hospital patients. To avoid renal damage and loss of auditory function, dosage should not exceed 1 Gm. per day nor be continued longer than 10 days."
The carton was enveloped by a wrapper on which also the very same warning was printed. In addition, both the wrapper and the carton had printed on it "Read insert for uses, warnings and toxicity."
In the carton was the insert (sometimes called "brochure" in the testimony) the pertinent parts of which read as follows:
"Warning: Intramuscular use of neomycin sulfate solution should be restricted to hospitalized patients with (1) serious systemic infections caused by gram-positive or gram-negative organisms  particularly Staph. aureus, K. pneumoniae, H. influenzae, P. vulgaris, Ps. aeurginosa  and organisms resistant to other antibiotics, and (2) urinary tract infections caused by strains of Ps. aeruginosa, E. coli, P. vulgaris or A. aerogenes resistant to other antibiotic and chemo-therapeutic agents but susceptible to neomycin.
When a total daily dose of neomycin exceeding 15 mg. per Kg. of body weight (more than one gram of neomycin per day) is continued for more than ten days, signs of toxicity referable to renal and auditory function are likely to develop. These nephrotoxic and ototoxic effects appear to be closely related. In the presence of intrinsic renal disease, neomycin excretion is impaired with resulting increases in serum neomycin concentrations and possible subsequent development of eighth nerve toxicity. The toxic effects of neomycin on the eighth nerve are principally auditory, appear to be additive to those produced by streptomycin, and are irreversible. Nephrotoxic manifestations, including mild albuminuria, presence of granular casts and depression of urinary output with elevation of blood urea nitrogen, are reversible, usually disappearing upon discontinuing administration of the drug.
Neomycin given intramuscularly in a total daily dose of 15 mg. or less per Kg. of body weight for less than ten days in patients with unimpaired kidney function has been shown to be usually well-tolerated *480 and not likely to give rise to clinical signs of toxicity. However, the procedures and precautions outlined in the following section should be strictly followed.

Procedures and Precautions for Intramuscular Use
(1) In the presence of impaired renal function neomycin should be administered parenterally only with extreme caution since, because of the delayed excretion of the drug, such patients may develop manifestations of eighth nerve toxicity at dosages tolerated by patients with normal renal function. Under such conditions the benefits that may be derived from parenteral neomycin therapy should be weighed against the possible development of deafness.
(2) Before starting parenteral neomycin therapy, the urine should be examined for albumin, casts and cellular elements, and blood should be taken for blood urea nitrogen or nonprotein nitrogen determination.
(3) During the course of therapy, the urine should be examined daily and the blood urea nitrogen determinations repeated twice.
(4) Audiometric tests should be made prior to and during the course of therapy, because evidence of impairment of hearing may be detected by the audiometer before clinical signs develop. This is especially important in patients who have received streptomycin or dihydrostreptomycin previously.
(5) Intramuscular injection of neomycin sulfate should not be continued for longer than ten days, and the total daily dose should not exceed 15 mg. per Kg. of body weight or a total of more than 1.0 Gm. The total daily dose should be divided into four equal doses injected intramuscularly every six hours. The parenteral use of neomycin sulfate solutions for systemic effect is limited to intramuscular injection only."
Defendant admitted he had never used the drug before he used it on plaintiff, and that before he used it he read what was printed on the carton, the wrapper, and the insert. He insisted that in all substantial respects he followed the manufacturer's directions.
Plaintiff bases his action against defendant upon grounds which may be grouped under three heads. First, says plaintiff, defendant should not have prescribed mycifradin for him at all. Second, even if defendant were justified in prescribing it for him, he failed to take the precautions and make the studies that should have been taken and made before the drug was administered to him. Third, defendant failed to take the precautions and make the checks that should have been taken and made while the drug was being *481 administered, for they would have warned defendant to discontinue its use.
The evidence shows that plaintiff had indications of "intrinsic renal disease" or "impaired renal function." The brochure warns that "under such conditions the benefits that may be derived * * * should be weighed against the possible development of deafness." Plaintiff's expert testified that in such a case the drug should be used only in cases of extreme urgency, when the patient is deathly sick and other drugs and less drastic remedies are not available or have not helped. Defendant conceded at the trial that "it was not an emergency."
Plaintiff's expert testified that plaintiff was not sick enough to experiment with such a dangerous drug, but that even if plaintiff had been a great deal sicker than he was, no doctor exercising reasonable care would have prescribed it without first finding out (1) what organism was making him sick, and (2) whether that organism was vulnerable to mycifradin. This, plaintiff contended, defendant did not do.
Defendant admitted he found none of the organisms named in the brochure against which the use of the drug was recommended, but he argues that he was justified in using the drug because he had found staphylococcus albus, which he and his experts called a first cousin to the "staphylococcus aureus" mentioned in the brochure. However his own witness, Dr. Fernicola, testified "aureus is far more pathogenic."
Therefore, the jury had the right to find that the organism that affected plaintiff was not serious enough and did not make him sick enough to risk deafness.
Plaintiff points out further that even if it were, the defendant made no test to determine whether the particular organism was vulnerable to mycifradin. The laboratory report was "nonhemolytic staphyloccocus, probably the albus group." A simple laboratory test was described by Dr. Goldner with which the effect of an antibiotic on an organism can be determined. Defendant admitted he ordered no such test. He and his expert, Dr. Ritota, claimed that such *482 tests were not available at that time, but the testimony on that point was such that the jury did not have to believe it. Therefore, the jury had the right to conclude not only that defendant did not know precisely what organism was ailing plaintiff but in addition that he failed to exercise reasonable care to find out whether the drug would do any good.
Plaintiff first consulted Dr. Monaco on March 6, 1955. At that time he had fever, purple blotches (purpura) under the skin of his legs, and swollen ankles. The defendant ordered plaintiff to the hospital immediately and wrote the admitting diagnosis in the hospital record as "Nephritis, Diverticulitis of the large bowel." Nephritis was defined by defendant as "an infection of the kidney." Later on the day of his admission plaintiff was examined by a resident physician of the hospital who noted on plaintiff's chart, "working diagnosis, after physical examination, kidney disease." Defendant examined the chart daily when he visited the plaintiff.
Various examinations and tests were made in the hospital which revealed casts, albumin and blood in the plaintiff's urine. These things and other symptoms and findings noted in the hospital record were admitted by defendant and his witnesses to be signs that kidney disease or impaired kidney function might be present. Defendant's expert, Dr. Ritota, testified that casts are impressions of the small tubules in the kidneys, and "therefore if the tubule doesn't work well some sediment gets stuck there and they form sort of a mold * * *."
Dr. Ritota, an internist connected with the hospital, had been called in for consultation by defendant. Dr. Ritota's preliminary impression was that there was a possibility of kidney disorder and he recommended that further tests be conducted and that Dr. Fernicola, a urologist connected with the hospital, be called in. On March 23 Dr. Fernicola made an intravenous pyleogram. The report of this was "films following the dye show normal functioning kidneys. No urinary tract pathology demonstrated." On the other hand a "Fishberg concentration test" showed a glomerular function *483 of only 25% to 50% of normal  in other words, a loss of function possibly as great as 75%. The glomeruli were definied by Dr. Ritota as "little groups or tufts of capillaries in the kidneys which is the center of the filtration plant of the kidney."
The defendant and his consultants could not determine precisely what was wrong with plaintiff so on March 27, 1955 he was discharged from the hospital. The discharge diagnosis written into the hospital record by defendant was "nephritis acute * * *."
Two or three days later plaintiff came to defendant's office and told him that he had passed blood. Defendant ordered him back to the hospital, which he reentered on April 4. This time defendant wrote into the hospital record an admitting diagnosis of "right uretral calculus," or kidney stone. The night nurse on duty April 4-5 noted on plaintiff's chart "abdomen and legs distended. Says he drinks more than his output * * *."
The plaintiff remained in the hospital from April 4 until May 6. Again there were swelling, purpura, and albumin and blood in the urine. There was a burning sensation upon urination. Dr. Ritota and Dr. Fernicola were again called in. On April 5 Dr. Fernicola did a cystoscopy which revealed bleeding from the right kidney. An intravenous pyleogram of the right kidney, done at the same time, was reported "suggestive of compression of calyces." Another pyleogram on April 11 revealed "deflection of calyces in mid portion of right kidney * * * possible result of space occupying lesion or normal variation." The calyces were described by Dr. Ritota as "* * * branches which come from the glomeruli or the factors of filtration. They are the collecting channels where urine is collected * * *" Dr. Ritota described the compression or deflection of the calyces as a "deformity in the canal * * * you assume there must be some pressure from without." Dr. Ritota said that did not necessarily impair the function of the kidney, but it was something that would have to be "investigated." Plaintiff's expert testified "the laboratory evidence was rather *484 conclusive that the man did have a kidney disease with impaired function."
Up to April 14 the only antibiotic that defendant had tried on plaintiff was terramycin, although it was testified that at that time there were more than 50 antibiotics on the market, of which mycifradin was one of the three or four most dangerous.
It would serve no useful purpose to review all of the other testimony on the issue whether this drug should have been used on him at all. Suffice it to say that defendant denied or attempted to explain all of plaintiff's allegations. He and his experts denied that plaintiff had any impairment of kidney function, or any other symptom or condition that would have warned any reasonably competent and careful doctor not to use the drug or to use less than was prescribed. They denied that the drug caused the deafness, or that there were other tests which should have been made or other drugs which should have been first tried.
Our examination of the evidence and the legitimate inferences that may be drawn therefrom satisfies us that the jury had the right to conclude that the injection of mycifradin into plaintiff was contraindicated.
Plaintiff's expert testified further that even if the use of mycifradin upon plaintiff had been justified, a doctor who exercised reasonable care would, in the light of plaintiff's kidney symptoms, have kept the dosage well below the maximum allowed by the brochure for patients with normal renal function. Instead, Dr. Goldner testified defendant gave plaintiff as much or even more of the drug and for over a longer period than was permitted for one with normal renal function.
On April 14 defendant discontinued the terramycin and ordered the mycifradin to be injected intramuscularly. The first injection was at 8 P.M. on April 14. It is stipulated that from that date until April 22 plaintiff received 30 injections of 1/4 gram each, or a total of 7 1/2 grams. On the 22nd injections were discontinued. On April 30, upon defendant's orders, they began again and continued until *485 May 3. During that period 14 injections were given  four on April 30, two on May 1, four on May 2, and four on May 3. There was a sharp dispute as to how large each of these 14 doses was. At the trial defendant and his witnesses testified each dose was an eighth of a gram. However in his pretrial deposition, read at the trial, defendant had testified that each dose had been a quarter-gram, except on May 2 when it was a half-gram. Plaintiff's chart, on the other hand, contained varying notations. For six of the doses no dosage was noted. For one it was "1 c c," and the remaining seven (May 2 at 12-6-12 o'clock and four on May 3) were noted as a half-gram each.
The defendant and his consultants still could not find out what was wrong with plaintiff, so on May 6 he was discharged from the hospital as "improved," but he continued under defendant's care. A few days after May 6 plaintiff became aware of some loss of hearing. He reported this to defendant, who assured him the hearing would return. Instead, it grew progressively worse and now plaintiff has no useful hearing in either ear.
If the evidence proved any negligent act or omission which was the proximate cause of the plaintiff's deafness, the verdict must stand. Tuccillo v. John T. Clark & Son, 104 N.J.L. 122, 128 (E. & A. 1927). By the same token, if there was evidence sufficient to go to the jury of a single such negligent act or omission, the defendant's motions for dismissal were properly denied. Had there been a special verdict under R.R. 4:50-1, or a general verdict accompanied by answers to interrogatories under R.R. 4:50-2, we would have known upon what underlying facts the jury found negligence. Such verdicts "enable errors to be localized * * *," and in a case such as this "contain many valuable potentialities." Terminal Const. Corp. v. Bergen County etc. Dist. Authority, 18 N.J. 294, 319 (1955). One of the "valuable potentialities" is that such verdicts compel a fuller elucidation of the facts and the principles of law applicable thereto than was given in the charge to the jury here. We have pointed out that in a case such as this such *486 elucidation should be given. Flynn v. Stearns, 52 N.J. Super. 115 (App. Div. 1958). Here it was not requested, and no point is made of it on this appeal.
Since we cannot know which fact issues the jury resolved in favor of defendant and which against him, defendant in his briefs has been compelled to review all of the testimony bearing upon each allegedly negligent act or omission. For example, defendant says in his brief:
"The testimony reveals that after Terramycin proved ineffective, the defendant and his internist consultant, Dr. Ritota considered all the other antibiotics and decided that since Terramycin did not do the job, Neomycin was the only one that would be effective. * * *
On cross-examination plaintiff's expert admitted that if the general practitioner called in both an internist and a urologist as consultants, he demonstrated more than average prudence. He also admitted that the general practitioner would follow the advice of his specialists. The evidence disclosed that the defendant did call in both an internist and an urologist in consultation; that he was always guided by his consultants and that Dr. Ritota even told him what dosage to use."
Since proof that a single negligent act or omission caused the deafness is sufficient to support the judgment below, it is unnecessary to deal with all of the remainder of the voluminous evidence in detail. Some of that remainder will be dealt with below in the discussion of specific issues. The balance has been carefully considered but does not need to be recounted.
Defendant argues that "a close examination" of the testimony of plaintiff's only expert, Dr. Goldner, "reveals that his opinions were based not on his knowledge of accepted standards, but solely on the * * * brochure." The defendant concedes that the brochure was properly admitted in evidence, Salgo v. Leland Stanford Jr. University Board of Trustees, 154 Cal. App.2d 560, 317 P.2d 170 (D. Ct. App. 1957), but he argues that a manufacturer's brochure alone cannot establish the standard of due care in the use of a drug, and since there was no other testimony here, plaintiff's case should have been dismissed, citing Carbone v. Warburton, 11 N.J. 418, 428 (1953).
*487 That is a surprising argument from defendant, for he testified he had looked at nothing but the brochure because he "didn't think it was necessary," and that he had followed its directions. Be that as it may, we do not need to decide whether it is true that a manufacturer's brochure may never, standing alone, be sufficient to establish the standard of care in the use of the described product, for in this case Dr. Goldner testified his opinion of improper prescription of the drug by defendant was not based on the brochure only. He testified that he was familiar with the drug and with literature other than the brochure which described the drug's dangerous propensities. He mentioned the Journal of the American Medical Association, the Annals of Otolarynology and Rhinolaryngology, and the Annals of Internal Medicine, which he described as "the type of journal that many physicians and specialists who practice internal medicine would use." In addition, he said the drug's dangers were described in the Physician's Desk Reference and in Merck's Manual, one or the other or both of which every doctor owns because they are distributed free. Dr. Goldner testified that he never used the drug except locally, and that no doctor exercising reasonable care would use it otherwise "except under a very stringent set of circumstances" because
"It is related to the streptomycin group. In fact it was at the Rutgers University in this state where the streptomycin group was discovered. Neomycin was also discovered as a variant. It was found useful in certain types of conditions. Its greatest use was used locally, in other words, in the form of a wet dressing, in the form of an ointment, in the form of a powder. It was also found useful in certain types of kidney disorders due to infections if the drug were administered in a form of a pill or a capsule. It was soon found, however, by animal experimentation and actual observation in human beings that it was very highly toxic and therefore certain limitations for its use were strictly delineated. It was found to be extremely toxic for the inner ear particularly and it was also found to be highly toxic for the kidney and it, therefore, was never recommended that it ever be used intramuscularly, which is by injection, except under a very stringent set of circumstances."
*488 Defendant makes the further argument that the testimony proves he consulted with the specialists Ritota and Fernicola; that they advised him plaintiff had no impairment of kidney function and it was safe to use the drug on him; and that Ritota advised him to give the dosage which he gave. Therefore, says defendant, that proves conclusively he exercised reasonable care and his motions for dismissals should have been granted. Defendant cites no case in support of this proposition.
Generally, such consultation is merely evidence of due care and does not in and of itself conclusively establish due care. "The mere fact that the physician * * * acted on the advice of another physician does not constitute a defense to an action based on unskilled treatment." 70 C.J.S. Physicians and Surgeons § 58, p. 982. Cf. Kuehnemann v. Boyd, 193 Wis. 588, 214 N.W. 326, modified 215 N.W. 455 (Sup. Ct. 1927). The reason is obvious. In spite of the consultation the general practitioner still owes to the patient the duty to exercise his powers of observation and that degree of skill and learning possessed and exercised under similar circumstances by competent general practitioners. The case must be rare indeed in which the advice of a consultant will be an absolute defense to a doctor who closes his eyes completely and shelves that skill and caution which even a general practitioner must use.
However, defendant argues (in the portion of his brief quoted above) that here plaintiff's own expert said that if the general practitioner called in both an internist and an urologist as consultants, he demonstrated more than average prudence and that the general practitioner usually follows the advice of his specialists. This testimony, argues defendant, fixed the standard of due care for this case (Carbone v. Warburton, supra), and since defendant proved he adhered to it, the motions for dismissal should have been granted.
What Dr. Goldner actually said in his testimony was that if on "adequate consultation" the specialists of "internal and urological medicine" approved, it would have been *489 proper for defendant to proceed with the use of the drug. Dr. Goldner did not define "adequate consultation" except to indicate that it depended "upon what his (the general practitioner's) own qualifications be." In other words, the less the consulting doctor knows the more he is obliged to inquire of the consultants. Therefore, a consultation obviously is not adequate unless the general practitioner makes sure the specialist knows all the essential facts and obtains from him answers to all questions which, in the exercise of reasonable care, he should ask. In the case at bar the jury was entitled to conclude that meant defendant should have shown the brochure to the consultants, and asked them about the applicability of the frightening warnings to plaintiff's case.
The evidence in this case left it highly doubtful whether here there had been such an "adequate consultation." Significantly, defendant himself did not ask for a binding instruction that there had been such a consultation. Defendant did not even ask that the jury be charged that if there was "adequate consultation" there was due care, or that the use of the drug would be proper if the specialists advised him it could be used. Defendant merely asked for this charge:
"14. Dr. Monaco, as a general practitioner, had a right to rely upon the opinions and judgment of any specialists called into the case for consultation and advice."
It is equally significant that the trial judge, who had heard all of the testimony, refused to give that charge without first modifying it by adding "and the weight of the proof in that respect is for your determination"; and defendant, knowing what the testimony was, made no objection to that modification, undoubtedly because the evidence warranted it.
Dr. Fernicola frankly admitted he was not familiar with the brochure at the time he was consulted; that defendant did not show it to him; that he was "not too thoroughly" *490 familiar with the drug; and that he did not know it could produce deafness. Then he testified:
"Q. Doctor, you did not advise the use of Mycifradin, did you? A. I did not.
Q. Did you give any instructions to Dr. Monaco as to its use? A. No, I did not.
Q. Either affirmatively or negatively? I don't know if I made myself clear. You gave him no instructions as to what to do or what not to do in the administration of the drug or any side tests as the drug was being administered. Is that correct? A. Correct.
Q. Were you familiar with the fact at that time that Mycifradin was extremely toxic to the eighth nerve and the possibility of the production of deafness? A. No.
Q. I therefore assume that you did not tell that to Dr. Monaco, or advise him with reference to that. A. No.
Q. Did you order or advise a sensitivity test to be made at the time? A. No.
Q. Of course, as you said, you did not have the brochure at the time that the drug was first administered, Mycifradin, by Dr. Monaco? A. Yes.
Q. You were not requested and you did not on your own make any independent check of the literature with respect to this drug? A. No.
Q. Have you ever utilized this drug, Mycifradin, before in your practice? A. No."
It would serve no useful purpose to analyze Dr. Ritota's testimony in detail. Suffice it to say that it was for the jury to decide how much of his testimony it would believe, especially when taken in connection with the testimony of the defendant whose credibility may have been damaged in the eyes of the jury by his attempt to explain away his own admitting diagnosis of "Nephritis" and his March 27th discharge diagnosis of "Nephritis acute." He testified he had written them into the records with no belief in their truth, only to enable Marchese to collect insurance. This was his testimony on cross-examination:
"Q. Yesterday you told us that the discharge diagnosis was put in only for the purpose of making sure that the insurance payments were taken care of. Is that right? A. Yes, that's right.
Q. Now, will you tell us if that is still your testimony or whether this man was suffering from symptoms, indications that led you to the conclusion that he had a kidney infection? A. No, he did not have a kidney infection.
*491 Q. So that the final diagnosis that you put in that hospital report was not correct, is that so? A. True.
Q. Not being correct, you did consciously, willfully, and deliberately put down a final diagnosis which was not correct medically? A. That's right.
Q. You did that with respect to the admitting diagnosis as well? A. Yes.

* * * * * * * *
Q. In other words, you would put down anything you felt proper, as a physician, anything which could not be found specifically by anybody checking, namely, like a fractured leg. Is that what you mean, Doctor? A. Probably."
In short, whether there had been an "adequate consultation" and whether the advice and instructions defendant said he received from the consultants were in fact given were for the jury. Ferdinand v. Agricultural Insurance Co., 22 N.J. 482 (1956).
Defendant's original brief of 13 pages gave the following "Statement of Questions Involved":
"1. Was the defendant guilty of negligence which was the proximate cause of injury or damage to the plaintiff?
2. Was the Court in error in refusing to charge the jury as to what they could take into consideration in weighing the credibility of the witness?
3. Was the Court in error in refusing to charge the elements of malpractice as stated in Carbone v. Warburton?
4. Was the Court in error in refusing to charge the defendant's request relating to weight of evidence?
5. Was the verdict contrary to the weight of the evidence?
6. Was the verdict excessive, and the result of passion, prejudice or mistake?"
After plaintiff's original answering brief was filed defendant obtained leave to file a reply brief "in excess of the usual 10 pages" and filed one of 30 pages. In it defendant not only treated the points raised in his original brief more fully but in addition attacked two hypothetical questions asked by plaintiff of Dr. Goldner. Since said "Statement of Questions Involved" did not raise the admissibility of these questions as a ground of appeal, the reply brief may not do so. R.R. 1:7-1(c); Gierkont v. Gierkont, 46 N.J. Super. 112, 119 (App. Div. 1957). *492 Apparently conscious of that fact, defendant's reply brief therefore attacked the hypothetical questions, not on the ground that they were not admissible but (under the heading "Causal relation was not competently established by plaintiff's proofs") on the ground that when answered the questions did not constitute competent evidence of proximate cause. Therefore, argued defendant, since without the answers to these questions there was no proof of causal relation, defendant's motions to dismiss should have been granted.
Since we felt that the reply brief advanced arguments not anticipated by plaintiff's brief answering defendant's original brief, we directed plaintiff to file a rejoinder brief and gave defendant leave to file a sur-rejoinder brief if he found it necessary. In the sur-rejoinder brief defendant for the first time argued that these questions were not admissible and, since the questions may not have been objected to below in a fashion sufficient to make room for the arguments advanced on appeal, that this court should regard the questions as "plain error" under R.R. 1:5-3 and reverse. Since, as we said, this argument is beyond the scope of the "Statement of Questions Involved," it will not be entertained. However, we have examined the hypothetical questions and the answers thereto and we find no merit in any part of the attack of the defendant upon them.
The argument addressed to the first question may best be presented in defendant's own words, taken from his brief:
"* * * plaintiff's contention as to the number of doses given and the quantity of each must be and should have been clearly set forth and included in the question. However, it was not. In the above question, it was stated that `on the basis of an assumption that this neomycin was administered to this patient in quarter gram doses every six hours on April 15, 16, 17, 18, 19, 20, 21 and part of 22, 1955, and then commenced again on April 30 and May 1, and on a further assumption that on May 2 he was given three doses of half a gram each; on May 3 he was given three doses of half a gram each  that is, per day  * * *.' While the question does assume the giving of quarter gram doses every six hours from the 15th through the 21st, it does not establish or set forth the number of doses nor the dosage for the 22nd, the question *493 merely stating `and part of 22.' Certainly if excessive dosage is plaintiff's charge, as it was, the exact dosage should have been stated for each day, setting forth the exact quantity as to each dose, even if merely plaintiff's calculation of dosage. Such a failure is crucial herein and constitutes substantial error. The failure to detail the precise dosage given on any one of the several days, not only permitted the expert to speculate on the dosage given on such a day or days, which was improper in itself, but it further permitted the jury to consider the matter without the proper foundation being set forth and expressed in the hypothetical question."
The second question contained this language:
"* * * will you tell us whether or not the administration of this drug on the following dates, April 15, April 16, April 17, April 18, April 19, April 20, April 21, April 22, April 29, April 30, May 1, May 2 and May 3, being in all on 13 days, coincides with the use of the normal care and skill of the profession * * *."
Defendant says, in his brief:
"This question merely sets forth a series of dates as to administration of the drug without any details as to dosage in any respect upon the several days. It permitted the witness to assume dosage from the smallest measurement to the largest on any such day, thereby permitting sheer speculation."
The substance of the arguments advanced against the two questions is that (a) they were not clear to the doctor, and (b) they were not clear to the jury. Although it would have been far better (and far less likely to endanger the verdict) if counsel had heeded the supplications of our appellate courts and had prepared the hypothetical questions more carefully (preferably in writing in advance of the trial; cf., Stanley Company of America v. Hercules Powder Co., 29 N.J. Super. 545, 564 (App. Div. 1954), reversed on other grounds 16 N.J. 295 (1954)), we perceive no prejudicial error in the respects urged.
Plaintiff's hospital charts were in evidence and Dr. Goldner had examined them. They showed the days upon which injections were given and (except as indicated above) the dosage. The parties had stipulated that between April 14 and April 22 plaintiff had been given 30 injections of *494 1/4 gram each. There were in evidence the pretrial deposition admissions of the defendant as to the dosage. This evidence supported the challenged excerpt from the first question.
Defendant argues also that the first question was confusing because it was not clear whether plaintiff meant that on May 2 and 3 he was given three doses totaling 1/2 gram each day, or whether it meant three doses of 1/2 gram each each day. This argument would have some validity if there were no testimony that the plaintiff had received three doses of 1/2 gram each, or a total of 1 1/2 grams per day on May 2 and May 3. As a matter of fact the plaintiff's chart showed that on May 2 and May 3 plaintiff received four doses each day of 1/2 gram each. As to the dosage on "part of (April) 22" the hospital record shows that he received only one injection of 1/4 gram that day but it was included in the stipulated 30 injections totaling 7 1/2 grams.
Defendant complains that the second question referred to injections for a total of 13 days. He cannot argue this was prejudicial, for actually the injections were given for a total of 14 days. Defendant argues, however, that whether giving the drug more than the ten days was contrary to the warnings of the brochure depends on the actual dosage given each day, and that the second question "permitted the witness to assume dosage." That argument can be advanced only by tearing that question out of its context. The other testimony had already covered the dosage.
For the foregoing reasons we conclude that the motions for judgment were each properly denied and that the motion for a new trial as to liability was also correctly dealt with, since the verdict was not so unsupported by the evidence that either the trial court or we would be justified in setting it aside.
Defendant asserts as grounds of appeal that the trial court erred when it refused to give defendant's requests to charge 13, 16 and 17. The trial judge declined to give these on the grounds "the contents have been sufficiently charged." We have examined the judge's charge and find *495 that therein he did in his own words adequately charge the substance of these requests. Hence it was not error to refuse them.
This brings us to the question whether the verdict of $56,000 was excessive.
The testimony shows that plaintiff had been ailing and unable to work (except perhaps for brief periods) for about four years before he received the mycifradin injections. After he withdrew from defendant's care he was confined in several hospitals. In one, in late 1955, his condition was diagnosed as lymphosarcoma, and he has been treated with nitrogen mustard for that dread disease. In addition plaintiff now has diabetes and a mass in his abdomen the size of a grapefruit which he refuses to have surgically explored or removed. Plaintiff does not contend that defendant is in any degree responsible for any of these conditions. The testimony is that because of his condition he would be unemployable even if he were not deaf. There was no proof of any loss of earnings, medical expense or any other "special" damages.
However, plaintiff's present physician, Dr. Warner, to whom plaintiff came for treatment after he left the hospital in which the diagnosis of lymphosarcoma was made, called as a witness by the defendant, testified that he now is not sure the diagnosis of lymphosarcoma was correct. He testified that he has been unable to determine positively whether or not plaintiff has lymphosarcoma, because plaintiff will not consent to surgery and because of the change in plaintiff's system produced by the treatments. He said "he is a sick man and I don't know the diagnosis."
Defendant argues that under these circumstances the verdict of $56,000 is so grossly excessive that it must have been the result of passion, prejudice or mistake  to quote the defendant's brief, it was "an attempt to inflict punitive rather than compensatory damages." Therefore, argues defendant, the least he is entitled to is a new trial as to damages and that the trial court was in error in denying it.
*496 Plaintiff, however, emphasizes that he was only 48 years old when he became deaf; that his deafness is total and incurable; that prior to his deafness he never had any trouble with his hearing and, though ill, he enjoyed company, conversation, music (in his youth he played musical instruments), records, television and radio. All of this is now gone, but what is worse, said plaintiff and Dr. Goldner his expert, is the tinnitus from which plaintiff suffers as a concomitant of the deafness, due also to the damage done by the mycifradin.
Tinnitus was described by the plaintiff as constant noises in his head "like the blast of wind, just like the bursting of bombs, cricket sounds, whistling sounds, distant sounds, all sorts of sounds. I can't sleep nights." He tries to sleep "* * * and all of a sudden a burst of wind comes and I am through sleeping * * * just stay awake, waiting for daylight to come." When asked what effect the tinnitus had had on his nervous system he answered "My God, I have been so nervous that I shake all over. My poor wife has to keep writing all day to me." He testified that he was unable to engage in any conversations, even with members of his family  "no conversations; everything is done in writing." It is to be noted that at the trial plaintiff's testimony had to be taken in accordance with the following stipulation of counsel: "The reporter is to type the question as asked and transmit it on the steno machine, and upon that being completed the typewritten question will be submitted to the witness and he, of course, will answer it orally which will be taken down on the steno machine."
Dr. Goldner testified that plaintiff's tinnitus was "very disturbing." Without objection Dr. Goldner testified:
"Q. Doctor, would you have any opinion as to the effect of these noises in the ears on the patient's general well-being, his nervous condition? A. I would.
Q. Would you tell us what that is in this case? A. I know that it is very disturbing and many patients whom we have to treat for this distressing condition, many of them are almost deranged by the character of the noise. Some of them have even *497 threatened suicide and things of that type in very severe forms, and it is a very disturbing and distressing symptom which we cannot help very often.
Q. Have you found that in many cases of this type? A. Not to the extent we found in this man."
It is settled that damage verdicts in personal injury cases "should not be disturbed unless they are so excessive in amount `as inevitably to give rise to the inference of mistake, passion, prejudice or partiality, and by that standard to be palpably against the weight of the evidence.'" Wytupeck v. City of Camden, 25 N.J. 450, 466 (1957); Carlucci v. Stichman, 50 N.J. Super. 96, 98 (App. Div. 1958). The reason is that
"The appellate tribunal cannot invade the constitutional office of the jury; it may not merely weigh the evidence where it is fairly susceptible of divergent inferences and substitute its own judgment for that of the jury; there may be judicial intervention only if the verdict is so far contrary to the weight of the evidence as to give rise to the inescapable conclusion of mistake, passion, prejudice, or partiality." Wytupeck v. City of Camden, supra, 25 N.J. at page 466.
In that case Justice Heher also said that
"The standard governing the trial judge in such inquiries was * * * whether the jury's verdict `could rationally and dispassionately be reached by laymen on the basis of the evidence' * * *."
In the case at bar, although the verdict appears to us to be liberal, we cannot say that it is so excessive as to empower the trial court or us to interfere with it, under the principles above stated. True, plaintiff is very sick with illnesses not the fault of the defendant. True, his life expectancy cannot be that of a healthy individual. But for whatever will be the balance of his life, plaintiff will be deaf and will be tormented by the tinnitus. As was said in Wytupeck v. City of Camden, supra, 25 N.J. at page 465, "We need not dwell on the personality and psychological changes, the everlasting depression of morale and spirit * * *" consequent upon this deafness and tinnitus. We cannot say that the jury could not rationally *498 and dispassionately arrive at the figure of $56,000 as damages for that which plaintiff has suffered and will continue to suffer for the balance of his life.
Defendant has argued that the verdict as to damages was so excessive that it indicates that the entire verdict, as to liability as well as damages, was the product of mistake, partiality, prejudice or passion. What we have said disposes of this argument also.
The judgment is affirmed.