418 A.2d 1361

**Naomi JONES and Ray Jones, her husband, Appellants,**

**v.**

**MONTEFIORE HOSPITAL, Marvin Silverblatt, Edward L. Waisbrot, Stanley A. Hirsch, Gerald I. Kaufer, Silverblatt Medical Associates, a Pennsylvania Professional Corporation, and Surgical Associates, a Pennsylvania Professional Association.**

Superior Court of Pennsylvania.

Argued April 10, 1979.

Filed Feb. 13, 1980.

---

424

P. Christian Hague, Pittsburgh, for appellants.

Charles H. Alpern, Pittsburgh, for Montefiore Hospital, appellee.

William R. Tighe, Pittsburgh, for Silverblatt, appellee.

John W. Jordan, IV, Pittsburgh, for Surgical Associates, appellee.

Before VAN der VOORT, SPAETH and WATKINS, JJ.

SPAETH, Judge:

This appeal arises from a judgment in favor of the defendants in a medical malpractice action. Appellants, Naomi Jones and her husband, Ray Jones, argue 1) that for several reasons, they are entitled to a new trial, and 2) that the lower court improperly assessed against them the cost of having the court reporter prepare a transcript to be included in the record on this appeal.

On November 7, 1973, Naomi Jones complained to Dr. Marvin Silverblatt, her physician, of a mass in her right breast. After examining Mrs. Jones, Dr. Silverblatt referred her to Surgical Associates, a professional association that specializes in the diagnosis and treatment of breast cancer. On November 19, 1973, Dr. Waisbrot, a member of Surgical Associates, examined Mrs. Jones and discovered two masses in her right breast; one of these masses was at 12:00 o'clock, or in the superior aspect of the breast, the other, at 6:30, or in the inferior aspect. Mrs. Jones was subsequently admitted to Montefiore Hospital for a biopsy. On November 27, 1973, Dr. Kaufer, another member of Surgical Associates, removed material from Mrs. Jones's breast. Dr. Kaufer testified that this material was from the mass at 12:00 o'clock. (As will be discussed, a principal issue at trial was whether this was so). In removing the material, Dr. Kaufer was assisted by hospital personnel. The material did not reveal cancer, and Mrs. Jones was discharged from the hospital the following day. Following her discharge, Mrs. Jones continued to receive treatment from Dr. Silverblatt and Surgical Associates. Further examinations by Dr. Waisbrot, in particular in December 1973 and March 1974, revealed a mass in Mrs. Jones's right breast at 1:30.[1] Because Dr. Waisbrot did not consider additional treatment necessary, however, no further testing or surgery was performed. In August 1975, Mrs. Jones, concerned about the presence of this mass, which continued to increase in size and to cause pain, asked Dr. Miles Mrvos, with whom she worked at Magee Hospital, to examine her. Following Dr. Mrvos's examination, Mrs. Jones was examined again by Dr. Waisbrot on August 25, 1975. Dr. Waisbrot this time diagnosed the mass at 1:30 as probably cancerous, and Mrs. Jones was readmitted to Montefiore Hospital the same day. A biopsy confirmed Dr. Waisbrot's diagnosis, and a mastectomy was performed. In addition, because the cancer had

1. Mrs. Jones was also examined by Dr. Kaufer in December 1973 and April 1975. Dr. Kaufer, however, failed to discover any masses in Mrs. Jones's breast on these occasions.

spread to a lymph node, Mrs. Jones had to undergo chemotherapy and other treatment.

On October 10, 1975, Mr. and Mrs. Jones brought suit against Dr. Silverblatt, Silverblatt Medical Associates, Surgical Associates (including Drs. Waisbrot, Kaufer, and Hirsch, members of Surgical Associates, in their individual capacities), and Montefiore Hospital, alleging that in November 1973, they had negligently failed to remove the masses in Mrs. Jones's breast, and had negligently failed to perform necessary post–operative tests, as a result of which negligence Mrs. Jones contracted cancer that has shortened her life, impaired her health, and caused financial loss.[2] Trial commenced on February 28, 1978. A directed verdict was entered for Montefiore Hospital. Jury verdicts were returned in favor of all the other defendants.

Mrs. Jones first argues that the lower court committed reversible error in denying her request that the jury be instructed that "[a] person who undertakes to render services to another is liable for physical harm resulting from his failure to exercise reasonable care, if that failure increased the risk of harm." This point for charge was a paraphrase of the Restatement (Second) of Torts § 323, which in *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280 (1978), was held to be part of the law of negligence in this Commonwealth. Accordingly, to decide whether the lower court should have given the requested point for charge, we must see whether this case turns upon the same principle of law as did *Hamil*.

In *Hamil*, the facts were these. Mr. Hamil was taken to the defendant hospital, suffering from severe chest pains. Because of a faulty electrical outlet, the hospital's EKG machine didn't work. When the hospital offered no further aid, Mr. Hamil's wife took Mr. Hamil to the private office of a Dr. Saloom. Mr. Hamil died in Dr. Saloom's office while an EKG was being taken. At trial, an expert witness testified that if the hospital had treated Mr. Hamil properly,

---

2. Mr. Jones also alleged loss of consortium. As noted, both he and Mrs. Jones have appealed, but for the sake of simplicity this opinion will usually refer to the appeal as though it were only by Mrs. Jones.

using oxygen and pain relieving drugs, he would have had a 75% chance of surviving. The hospital argued that this evidence was insufficient to support a finding of proximate cause; according to it, the case could not go to the jury unless the expert expressed the opinion that to a reasonable degree of medical certainty the hospital's negligence caused Mr. Hamil's death. Plainly, the expert could not do this, because it was quite possible that even without the hospital's negligence, Mr. Hamil would have died.

The issue in *Hamil*, therefore, was the degree of certainty of proof required before someone may be held liable for negligence. The Supreme Court resolved this issue by adopting Section 323(a), and holding that evidence would be sufficient to support a finding of proximate cause if it appeared that the defendant's negligence had increased the risk of harm, and that that increased risk was in turn a substantial factor in bringing about the harm. In reaching this holding, the Court quoted with approval the statement that "[i]f there was any substantial possibility of survival and the defendant has destroyed it, he is answerable." *Hicks v. United States*, 368 F.2d 626, 632 (4th Cir. 1968).

The present case is not like *Hamill*. Mrs. Jones's claim was not that the defendants had *increased the risk* of harm (of her developing cancer) but that they had *done* or *caused*, that harm. Or to state the point conversely: The defendants here were not arguing, as they were in *Hamil*, that despite their negligence, Mrs. Jones might have developed cancer anyway; instead, they were arguing, in response to Mrs. Jones's claim, that nothing they had done had caused her to develop cancer. Thus, the issue between the parties had nothing to do with the degree of certainty of proof required before some one may be held liable for negligence. So that this may be understood, it is necessary to amplify the statement so far made of the facts of the case.

It will be recalled that in November 1973 two masses were found in Mrs. Jones's right breast: one at 12:00 o'clock, and the other at 6:30. According to the defendants, neither mass was malignant; as regards the mass at 12:00 o'clock,

this was determined by Dr. Kaufer's removal of material from it. Mrs. Jones acknowledged that Dr. Kaufer had removed material from her breast. According to her, however, the removal was not from the mass at 12:00 o'clock but from an area below the nipple.

It will also be recalled that after the biopsy, Dr. Waisbrot, in December 1973 and March 1974, found a mass in Mrs. Jones's right breast at 1:30, and that in August 1975 this mass was determined to be malignant and was removed. Mrs. Jones contends that this was the same mass as the mass found in November 1973, and that if it had been removed then, she would not have developed cancer. Plainly, given the defendants' testimony, this contention presented an issue of fact, which the jury evidently resolved against Mrs. Jones.

Mrs. Jones further contends that even if, as defendants contend, the mass found after the biopsy was a new mass, not present in November 1973, still, the defendants were negligent in not removing it until August 1975. Again, this contention presented an issue of fact, which the jury evidently resolved against Mrs. Jones, for the defendants contended that when the mass was found, and following the biopsy, the mass was too small and undefined to warrant immediate testing or surgery, and that in not removing it until August 1975, they acted properly.

If Mrs. Jones had tried her case on the theory that when she went to the defendants, she already had cancer [Mr. Hamil was already suffering severe chest pain when he went to the defendant hospital], and that the defendants' negligence in not removing the cancer [the hospital's negligence in not giving Mr. Hamil oxygen] substantially increased the risk that her breast would have to be removed [the risk that Mr. Hamil would die from the heart attack he was suffering], then this case would be like *Hamil*, and it would have been error not to have given Mrs. Jones's requested point for charge. Since this was not the theory on which the case was tried it was not error to refuse the

request.[3]  *Cf. Hrivnak v. Perrone*, 472 Pa. 348, 354–55, 372 A.2d 730, 733 (1977) (while a judge "must crystallize the issues raised by the litigants and explain the relevant principles of law, he may not assume the advocate's function of introducing theories not raised by the parties"); *Hronis v. Wissinger*, 412 Pa. 434, 437, 194 A.2d 885, 886 (1963) ("issues should not be submitted to the jury which are not relevant under the pleadings and proof"). As tried, the case turned on issues of credibility. If the jury accepted Mrs. Jones's evidence, causation was established; if the jury accepted the defendants' evidence, the conclusion followed that the defendants' acts, or omissions to act, did not increase by one iota the risk that Mrs. Jones would develop cancer.

What Mrs. Jones's argument comes down to, therefore, is a suggestion that the jury might have regarded the case as one involving increased risk, and that therefore it should have been instructed accordingly. However, counsel has not directed us to any part of the record showing that the issue of increased risk was developed and argued to the jury, or that the jury had reason to develop the issue itself from the evidence presented.

The most that can be said is that the court's failure to give the requested charge constituted a failure to expand its

3. An expert witness called by Surgical Associates did testify that the cancer discovered in Mrs. Jones's breast in 1975 had been there for at least three years; that had the cancer been discovered in 1973 the same surgical procedures would have been followed that were followed when the cancer was discovered in 1975; and that none of the defendants' acts increased the risk of harm to Mrs. Jones. Record at 471a, 483a. Such testimony might have presented a *Hamil v. Bashline* issue for the jury to resolve were it not for the fact that the expert witness's testimony (which comprises eighty–one pages of transcript) was addressed primarily to the issue of damages suffered by Mrs. Jones; that the expert's two references to the increased risk of harm caused by the defendants' acts were brief; and that Mrs. Jones's attorney chose not to pursue the point, either on cross–examination, or in closing argument to the jury. In a case where only two passing references are made to a theory not otherwise developed during the course of a two–week trial, and where none of the parties argues the theory during closing argument, and the court does not mention the theory in its summation to the jury, we believe it fair to conclude that the theory has not been presented sufficiently to the jury to require an instruction by the court.

general charge on proximate cause by instructing the jury on a potential theory of the case that was not developed by the parties. We might be willing to give greater weight to Mrs. Jones's argument that she is entitled to a new trial because of the court's failure to give the requested charge had the jury been asked, as it was in *Hamil*, to make special findings, and had these findings disclosed that the jury had denied Mrs. Jones recovery on the ground that although the defendants had negligently increased the risk that she would suffer harm, she had not proved to their satisfaction that harm in fact resulted from the negligence. However, "[a]ppellate courts are disinclined to reverse a judgment of a trial court for alleged inadequacy of the charge unless the inadequacy is such that the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said . . . ." *Voitasefski v. Pittsburgh Railways Co.*, 363 Pa. 220, 226, 69 A.2d 370, 373 (1949). *See also Harman v. Chambers*, 358 Pa. 516, 519, 57 A.2d 842, 844 (1948). Given the absence of any showing in the record that Mrs. Jones was prejudiced by the court's refusal to give the requested charge, we shall not order a new trial because the lower court refused to give the charge. *Compare Connelly Containers, Inc. v. Pennsylvania Railroad*, 222 Pa.Super. 7, 16, 292 A.2d 528, 533 (1972).

Mrs. Jones also argues that the lower court erred in denying certain other requested points for charge: 1) that a physician is required to use the scientific means and facilities open to him for the collection of the best factual data to arrive at his diagnosis, and his failure to use these means to secure an adequate factual basis for his diagnosis is not an error of judgment, but is negligence; 2) that a physician in a partnership who shares the responsibility for treatment of a patient has the duty to inform his partners of a condition requiring treatment, and to act upon facts disclosed to him by his partners, and is negligent for failing to so do; and 3) that a physician is liable for an erroneous diagnosis if the patient is inadequately examined or if the symptoms are not obscure but are not properly diagnosed. In considering

these arguments, we are required to look at the lower court's charge in its entirety. *McCay v. Philadelphia Electric Co.*, 447 Pa. 490, 291 A.2d 759 (1972). If the court included the substance of the requested instructions in its charge, it was not required to repeat the charge in the language requested by Mrs. Jones. *Junk v. East End Fire Department*, 262 Pa.Super. 473, 396 A.2d 1269 (1978); *Amati v. Williams*, 211 Pa.Super. 398, 236 A.2d 551 (1967).

The lower court charged the jury:

The law requires a physician to exercise reasonable skill and diligence in his professional acts. Reasonable skill and diligence means that he must use that degree of care such as thoroughly educated physicians normally employ. He must be qualified in his profession. He must have that degree of skill which ordinarily characterizes his profession. However, the present advanced state of the profession is to be considered in judging the presence or absence of their degree of skill. Thus, a physician is lawfully bound to keep abreast of the current improvements and standards in his profession. A physician who is a specialist is required to possess and employ the skill and knowledge usually possessed by physicians who are specialists in the same or similar locality. In employing the required skill and knowledge, the physician is also required to exercise the care and judgment of a reasonable man. Record at 486a–87a.

In addition, the court approved and gave substantial portions of the first two requested points, deleting only the last clauses in both, which were either misleading or extraneous. Furthermore, the court charged the jury that Drs. Waisbrot, Hirsch, and Kaufer were to be considered as a single person, so that if one was negligent, all were liable for the injuries caused by the negligence. In these circumstances, we find no error in the court's refusal to repeat Mrs. Jones's points verbatim.[4]

4. Mrs. Jones also argues that the lower court erred in not charging the jury that "[a] physician who refers his patient to a specialist and continues to treat his patient after the referral, is negligent in failing

Mrs. Jones argues next that the lower court erred in granting Montefiore Hospital's motion for a directed verdict. Mrs. Jones agrees, however, that a hospital is liable in a medical malpractice action only for its negligence, or the negligence of its agents. In addition, she does not appear to contend seriously that the jury could have held the hospital liable in the absence of expert testimony establishing such negligence.[5] The only expert testimony to which Mrs. Jones directs us in support of her claim that the hospital was liable was given by Dr. Arthur Davidson. Dr. Davidson testified that in his opinion Mr. (now Dr.) Harris Silvis and Dr. Michael Hynes, respectively a medical student and an intern, who were on the hospital's staff in November 1973, were negligent in examining Mrs. Jones before her

to determine that the specialist has not properly or adequately performed the treatment for which the physician referred the patient." Mrs. Jones, however, has failed to cite a single case supporting such a charge. *Marchese v. Monaco*, 52 N.J.Super. 474, 145 A.2d 809 (1958), upon which Mrs. Jones relies, held that although consultation between a general practitioner and specialists may be evidence of due care on the part of the general practitioner, it "does not in and of itself conclusively establish due care. . . . In spite of the consultation the general practitioner still owes to the patient the duty to exercise his powers of observation and that degree of skill and learning possessed and exercised under similar circumstances by competent general practitioners." 52 N.J.Super. at 488, 145 A.2d at 817. Thus, the court in *Marchese* held that a general practitioner who refers a patient to specialists must comply with the same standard of care as in all other circumstances: the reasonable man standard. We believe this holding is correct. *See generally Smith v. Yohe*, 412 Pa. 94, 194 A.2d 167 (1963); *Donaldson v. Maffucci*, 397 Pa. 548, 156 A.2d 835 (1959) (cases also relied on by Mrs. Jones). We also believe that the converse of *Marchese* is correct: A general practitioner is not necessarily liable for failing to determine that the specialists to whom he referred a patient did not adequately treat the patient. Since Mrs. Jones's requested charge implied that a general practitioner was necessarily liable, it was properly rejected.

5. In any event, we reject the notion that the hospital could be held liable for Mrs. Jones's injuries merely on her testimony that she was admitted to Montefiore Hospital to have two masses in her right breast removed, that she was examined by hospital personnel (who also assisted in the subsequent operation), that only one mass was removed, and that cancer in her breast was subsequently discovered. A layperson could not conclude from the fact that both masses were not removed that the hospital was negligent.

first biopsy. On cross–examination, however, Dr. Davidson admitted that Mr. Silvis's and Dr. Hynes's physical examination and medical write–up on Mrs. Jones were excellent, and that he noticed no failure in the performance of their duties towards Mrs. Jones. Dr. Davidson's only criticism of their conduct rested on the fact "that the two masses [in Mrs. Jones's breast] were not removed and it is encumbent upon all the people who have a part in the treatment process to see that both masses were removed." Record at 193a. Yet, Dr. Davidson further admitted that it was the duty of the operating surgeon (Dr. Kaufer) to decide where to operate, and that with respect to the operation he noted no failure on Dr. Hynes's part.[6] Since Dr. Davidson failed to specify in what way Mr. Silvis and Dr. Hynes negligently performed their duties, and since Mrs. Jones on this appeal has not premised the hospital's liability on any other acts, either by Mr. Silvis, Dr. Hynes, or another person, we hold that the lower court properly directed a verdict in favor of Montefiore Hospital.

■ Mrs. Jones argues next that the lower court erred in allowing Dr. Edwin Fisher, a defense witness, to testify that the cancer found in 1975 in her right breast had been present before her operation in 1973. Mrs. Jones claims that Dr. Fisher's testimony constituted an opinion that was not based on facts in evidence. The record contradicts Mrs. Jones's claim. Dr. Fisher's testimony was based on the size of the cancer removed from Mrs. Jones's breast in 1975 and the rate of cancer growth. Since Dr. Fisher testified that all possible rates of cancer growth placed the birth of Mrs. Jones's cancer as occurring before her 1973 operation, his testimony was competent, and was not based on conjectured facts unsupported by the record.

■ Mrs. Jones's final argument concerning trial error is that the lower court improperly limited her examination of several witnesses. She complains that the court refused to

6. It should be noted that Mr. Jones does not allege that the Dr. Kaufer ever acted as the hospital's agent, or that the hospital is in any way liable for his acts.

allow her to repeat statements by Dr. Mrvos that led her to seek treatment in August 1975. Mrs. Jones claims that the statements were relevant to establish why she sought treatment at that time, and were not hearsay since they were not offered for the truth of their contents. However, accepting Mrs. Jones's claim that the statements were not hearsay, they were nevertheless properly excluded since Mrs. Jones's state of mind in August 1975 was not relevant to any material issue. Mrs. Jones also complains that the lower court precluded effective cross–examination of Dr. Waisbrot regarding his treatment of her. The record shows, however, that the lower court did not preclude such cross–examination; rather, the lower court merely sustained an objection to the form of a single question posed by counsel for Mrs. Jones. The record further shows that the objection was properly sustained. Lastly, Mrs. Jones complains that her cross–examinations of Dr. Silverblatt and Dr. Silvis were improperly limited. We find these complaints without merit.

–2–

The remaining issue does not concern the judgment entered below in favor of the defendants, but the lower court's assessment against Mrs. Jones of part of the cost of the court reporter's transcription of the stenographic notes of trial.

■ On September 28, 1978, the lower court ordered Mrs. Jones to pay the court reporter the prevailing rate per page for transcribing the notes, less the statutory rate established by the Act of May 1, 1907, P.L. 135, § 8, *as amended* 17 P.S. § 1810, *repealed* by the Act of April 28, 1978, P.L. 202, No. 53, § 2(a), 42 Pa.C.S.A. § 20002(a) [899] (1979 Pamphlet), effective June 27, 1979 (known as the Judiciary Act Repealer Act), which was to be paid by Allegheny County, where the action arose and trial was held.[7] The lower court

---

7. The Allegheny County Solicitor's Office has filed an amicus curiae brief maintaining that the county is not responsible for any of the cost of transcribing the notes.

further ordered that the court reporter's transcript was "for the sole and exclusive use of" the trial and appellate courts, and directed the prothonotary to refrain from releasing the transcript to anyone without a written order by the court, so that if Mrs. Jones, or another interested person, desired a copy of the transcript, the copy had to be obtained from the court reporter upon payment of the prevailing rate. On October 23, 1978, this court, by *per curiam* order, directed the enforcement of the lower court's order at the county's expense, but stated that a final determination of who should pay for the court reporter's transcript would be deferred until this appeal had been heard on the merits.

In *Bonds v. Ohio River Co.*, 220 Pa.Super. 9, 11, 275 A.2d 883, (1971), this court stated: "It has long been the law of this Commonwealth that stenographic notes of testimony must be taken 'in any trial of fact, at law or in equity,' and that in any case in which an appeal is taken to the Supreme or Superior Courts, the notes must be transcribed at public expense." *See also Russell v. Philadelphia*, 236 Pa. 560, 84 A. 1101 (1912); *Clift v. Philadelphia*, 41 Pa.Super. 638 (1910); 15 Stand.Pa.Prac.–*Costs* § 63 at 617 (1965). The rule that payment for the transcription of the stenographic notes of trial is to be made by the public was established by the Act of May 1, 1907, *supra.* 17 P.S. § 1810 provides:

> Every official stenographer shall be paid . . . thirty cents for each one hundred words of every copy of the stenographic notes of trials and of other matters in connection with the business of the court, that are furnished to the court or filed of record . . .; payment for such copies to be made by the county in which the case is pending, or for which the work is performed upon the order of the presiding judge.[8]

---

**8.** The fact that this statute was repealed by the Judiciary Act Repealer Act presents no problem. Although the Judicial Code gives the Supreme Court, or its delegate, power to regulate the charges made by official court reporters for transcript services, and to prescribe by general rule the items which shall constitute taxable costs, *see* 42 Pa.C.S.A. §§ 102, 1724(a)(10), 1725, 1726, 3542 (1979 Pamphlet), the Court has yet to promulgate rules prescribing what items may be taxable costs. *See* 42 Pa.C.S.A. § 1702; 201 Pa.Code, chap. 157

Since the court reporter's transcript in the present case was prepared so that it could be filed of record, as required by Pa.R.A.P.1922, 17 P.S. § 1810 required the expense of the transcript to be borne by the county. *See also* 17 P.S. § 1809 (1962) *repealed by the* Act of April 28, 1978, *supra* (providing that in any case in which an appeal is taken to the Superior Court, the official stenographer is to make, certify, and file of record a typewritten copy of the stenographic notes of trial, for which payment is to be made in the same manner as if directed by the court). The lower court had no power to modify the provisions of 17 P.S. § 1810 by assessing part of the cost of transcription to Mrs. Jones. *Cf. Philadelphia v. Percival*, 464 Pa. 308, 346 A.2d 754 (1975) (plurality opinion); *Commonwealth ex rel. Swann v. Shovlin*, 423 Pa. 26, 223 A.2d 1 (1966) (local rule of court cannot vary or alter either laws of this Commonwealth or Rules of Appellate Procedure).[9]

The county argues that the Act of May 1, 1907, *supra*, has been suspended by Pa.R.A.P. 5101(e), which provides that the Rules of Appellate Procedure promulgated by the Supreme Court "are intended to provide a complete and exclusive procedure relating to appellate practice and procedure and . . . all statutes relating to practice and procedure finally enacted prior to May 1, 1978 are hereby suspended to the extent inconsistent with these rules." The

(1979). Thus, under 42 Pa.C.S.A. § 20003(b) (1979 Pamphlet), the practice and procedure under 17 P.S. § 1810 continues in full force and effect as part of the common law of the Commonwealth until such rules are promulgated.

**9.** The lower court did not avoid a modification of 17 P.S. § 1810 merely by assessing Mrs. Jones the difference between the going rate charged for the transcription of the stenographic notes of testimony and the statutory rate. 17 P.S. § 1810 specifically places the cost of transcription on the county.

Moreover, our cases hold that costs in actions at law in this Commonwealth depend on statute, and may not be imposed in the absence of statutory authorization. *Schultz v. Mountain Telephone Co.*, 364 Pa. 266, 72 A.2d 287 (1950); *Morganroth's Election Context Case*, 346 Pa. 327, 29 A.2d 502 (1943). Thus, even if the lower court's order did not modify 17 P.S. § 1810, the lower court nevertheless lacked authority to enter the order.

county claims that 17 P.S. § 1810 is inconsistent with Pa.R. A.P. 2155 and 2771. Pa.R.A.P. 2155, however, does not address the issue of who shall pay for the court reporter's transcription of the notes of testimony, but who shall pay for *reproducing* the record. The difference between the court reporter's transcript and the reproduced record is clearly shown in Pa.R.A.P. 102, 2151(a), and 2152(c). Pa.R. A.P. 2771, which addresses the costs that are recoverable by the winning party against the losing party on appeal, does not address the question of which items are taxable by a court against either party.[10]

Finally, this court answered long ago the county's argument that it should not be required to pay for the transcription of the notes of trial testimony because the dispute between Mrs. Jones and the defendants involved only private interests of no public moment. The Act of May 1, 1907, *supra*, "has general reference to public judicial proceedings and the rights of the parties engaged therein. The general subject is, therefore, one in which the public [has] an interest, with regard to which legislative action, in the interest of the public is absolutely necessary. . . . [The use of stenographers to report judicial proceedings] expedites judi-

---

**10.** We note that the Commonwealth Court has also recently concluded that the Rules of Appellate Procedure do not suspend 17 P.S. § 1810. *Cambria Savings & Loan Assoc. v. Capozzi*, 44 Pa.Cmwlth. 189, 403 A.2d 208 (1979). In *Cambria*, the Commonwealth Court did not specifically address the issue raised by Mrs. Jones–that is, whether 17 P.S. § 1810 permits a court to tax the difference between the prevailing rate charged for the transcription of the stenographic notes of testimony and the statutory rate.

The county also cites an unpublished order signed in January 1971 by Mr. Justice (later Chief Justice) BENJAMIN JONES for the Supreme Court in support of its contention that 17 P.S. § 1810 has been suspended. We do not believe, however, that the Supreme Court intended to suspend by an unpublished and unexplained order a statute that had been on the books for more than sixty years. Moreover, it is unclear from the Court's order, which did not assess costs but merely remanded the matter to the trial court to "determine whether the cost of transcription of said [trial] testimony shall be paid by both parties to the appeals or by such party as the Court of Common Pleas shall determine," to whom the order applied. While the term "such party" may have applied only to the parties on appeal, it may have also applied to Allegheny County, which sought to intervene in the matter.

cial procedure, economizes the time of public tribunals, and so promotes the prompt administration of justice and reduces the amount of public moneys in that behalf expended.
.  .  . [Furthermore, because the government] has made laws which ordain that a citizen for certain offenses shall forfeit his life or liberty and that, under certain conditions his property shall pass to others, and has constituted courts for the purpose of determining the existence of the facts and conditions and adjudging the consequences [i]t is therefore, to the interest of all the people that every proper safeguard should be provided to guard against mistakes in the administration of justice." *Clift v. Philadelphia*, 41 Pa.Super. at 642–43. *Accord, Russell v. Philadelphia, supra.*

The judgments in favor of appellees and against appellants are affirmed. The order of the lower court dated September 28, 1978, ordering appellants to pay the court reporter the prevailing rate per page for transcribing the notes of testimony, less the statutory rate established by the Act of May 1, 1977, *supra,* is reversed.